519 F.2d 681
 7 ERC 2073, 5 Envtl. L. Rep. 20,408
 The CITY OF HIGHLAND PARK, Illinois, etc., et al.,
Plaintiffs-Appellants,
v.
Russell E. TRAIN, etc., et al., Defendants-Appellees.
The CITY OF HIGHLAND PARK, Illinois, etc., et al., Petitioners,
v.
Russell E. TRAIN, as Administrator of the United States
Environmental Protection Agency, and United States
Environmental Protection Agency, Respondents.
 Nos. 74-1271, 75-1006.
 United States Court of Appeals,
Seventh Circuit.
 Argued Feb. 21, 1975.
Decided June 10, 1975.
As Amended on Denial of Rehearing July 24, 1975.
 
 Joseph V. Karaganis and Sanford R. Gail, Chicago, Ill., Berle L. Schwartz, Highland Park, Ill., Sheldon Davidson, Richard V. Houpt, Chicago, Ill., for plaintiffs-appellants.
 James R. Thompson, U. S. Atty., Gary L. Starkman, Asst. U. S. Atty., Chicago, Ill., Wallace H. Johnson, Asst. Atty. Gen., Edmund B. Clark and Raymond W. Mushal, Atty., Dept. of Justice, Washington, D. C., Bernard Carey, State's Atty., Fredric B. Weinstein, Melvyn A. Rieff, Asst. State's Attys., Burton Y. Weitzenfeld, Stanley M. Lipnick, John L. Ropiequet, John C. Christie, Jr., Chicago, Ill., Richard J. Denney, Jr., Environmental Protection Agency, Washington, D. C., Frederic O. Floberg, Chicago, Ill., for defendants-appellees.
 Before CUMMINGS, SPRECHER and TONE, Circuit Judges.
 TONE, Circuit Judge.
 
 
 1
 In the principal case before us in these consolidated proceedings, No. 74-1271, plaintiffs sue to block the construction of a shopping center and the extension and widening of the road along which the shopping center is to be built, relying upon the Clean Air amendments of 1970, the National Environmental Protection Act, and the Equal Protection Clause of the Fourteenth Amendment. They seek to compel the Administrator of the Environmental Protection Agency to promulgate "indirect source" and "significant deterioration" regulations which they hope would preclude the construction of the shopping center and the road expansion (Counts I and II) and to enjoin the road expansion until the Department of Transportation has filed an environmental impact statement pursuant to the National Environmental Protection Act (Count III). Plaintiffs also allege that the Village of Northbrook has denied them equal protection by the adoption of a zoning ordinance which permits the construction of the shopping center (Count IV).
 
 
 2
 The District Court dismissed the claims under the Clean Air Amendments for failure to comply with the 60-day notice requirement of section 304, 42 U.S.C. § 1857h-2, for failure to state a claim on which relief can be granted, and on the ground that some of the relief requested was already the subject of orders issued by other federal courts. Finding it undisputed that there was no federal involvement in the road expansion project, the court granted summary judgment on the claim that an environmental impact statement should have been filed. The equal protection claim was also held to be without merit. The court entered an order dismissing the action, City of Highland Park v. Train, 374 F.Supp. 758 (N.D.Ill.1974), from which plaintiffs appeal and which we affirm.
 
 
 3
 Plaintiffs are two municipalities adjacent to the site of the proposed shopping center, a non-profit corporation dedicated to protecting the environment in the area, and various individuals who reside near the site. The defendants are the Administrator of the Environmental Protection Agency, the agency itself, the Secretary of the Department of Transportation, the department itself, the Department of Highways of Cook County, Illinois, the developers of the shopping center, proposed tenants of the shopping center, the Village of Northbrook, in which the shopping center will be located, and the trustees of the village.
 
 
 4
 The right of way of Lake-Cook Road extends from Lake Michigan along the entire boundary between Lake and Cook Counties to the western end of the boundary and continues on west to the Fox River. Between Milwaukee Avenue and Rand Road, the road is not completed. Where it is completed, it is, for the most part, two lanes wide. In 1967 the Cook County Highway Department initiated plans to expand the completed portions of the road to four lanes and to construct a four-lane extension on the right-of-way where no actual roadway presently exists.
 
 
 5
 In January, 1973, certain of the defendants announced a plan for the construction of a shopping center on the south side of Lake-Cook Road between Skokie Highway and Waukegan Road. The shopping center, according to the complaint, will occupy one million square feet, have a parking lot accommodating 5,000 cars, and generate 28,400 vehicle trips per day. Ninety percent or more of this traffic will be carried by Lake-Cook Road, the only through-street which provides access to the shopping center. Plaintiffs allege that this traffic "will overwhelm even the proposed four lane expanded roadway," and cause "intolerable" congestion at the intersections of Lake-Cook Road and Skokie Highway and Waukegan Road. As a result, residents of the area will be subjected to substantial "noise and discomfort in the use of their homes and in the use of the streets in their community" and will be exposed to increases in the concentration of carbon monoxide in the ambient air by more than 66 percent over existing levels.
 
 
 6
 The Clean Air Amendments and Their Implementation
 
 
 7
 To explain plaintiffs' claims under the Clean Air Amendments of 1970, it is necessary to begin by summarizing pertinent parts of that legislation and its implementation by actions of the Administrator and the states and by certain court decisions. The background and a more complete history of the amendments and their implementation to date appear in Mr. Justice Rehnquist's opinion for the Supreme Court in Train v. Natural Resources Defense Council, Inc., --- U.S. ---, 95 S.Ct. 1470, 43 L.Ed.2d 731 (1975).
 
 
 8
 When the states did not act to fulfill their "primary responsibility" for prevention of air pollution under earlier federal clean air legislation, "Congress reacted by taking a stick to the States in the form of the Clean Air Amendments of 1970, Pub.L. 91-604, 84 Stat. 1676, enacted on December 31 of that year." Train v. Natural Resources Defense Council, Inc., supra, --- U.S. at ---, 95 S.Ct. at 1474. The 1970 Amendments established a program to control air pollution to be carried out by the federal government and the states. The parts of the Amendments pertinent here may be summarized as follows:
 
 
 9
 The Administrator was required, before specified dates, to publish a list of air pollutants and issue "air quality criteria" containing information about each listed pollutant and its effects on the air. (Section 108, 42 U.S.C. § 1857c-3.) He was also required to establish national "ambient air quality standards" for each air pollutant for which air quality criteria were issued. (Section 109, 42 U.S.C. § 1857c-4.) The states have primary authority to establish "implementation plans" to achieve these standards, but these plans are subject to review by the Administrator. (Section 110, 42 U.S.C. § 1857c-5.)Two sets of standards were to be prescribed by the Administrator, "primary standards," the "attainment and maintenance of which, in the judgment of the Administrator, based on (air quality) criteria and allowing an adequate margin of safety, are requisite to protect the public health;" and "secondary standards," which "shall specify a level of air quality the attainment and maintenance of which in the judgment of the Administrator, based on such criteria, is requisite to protect the public welfare from any known or anticipated adverse effects associated with the presence of such air pollutant in the ambient air." (Section 109(b), 42 U.S.C. § 1857c-4(b).) The Administrator prescribed these standards within the time allowed him by the Act.
 
 
 10
 Within nine months after the Administrator's promulgation of the national standards, each state was to submit to him a plan providing for the "implementation, maintenance, and enforcement" of the standards. (Section 110(a)(1), 42 U.S.C. § 1857c-5(a)(1).) Each state plan was required to provide for the attainment of the national primary standards "as expeditiously as practicable" and not later than three years after the date the Administrator approved the plan. (Section 110(a)(2)(A)(i), 42 U.S.C. § 1857c-5(a)(2)(A)(i).) The national secondary standards were to be met within a "reasonable time" to be specified in the plan. (Section 110(a)(2)(A)(ii), 42 U.S.C. § 1857c-5(a)(2) (A)(ii).) Each state plan was to include "emission limitations, schedules, and timetables for compliance with such limitations, and such other measures as may be necessary to insure attainment and maintenance of such primary or secondary standard, including, but not limited to, land-use and transportation controls." (Section 110(a)(2)(B), 42 U.S.C. § 1857c-5(a)(2)(B).) Other prerequisites to approval by the Administrator are set forth in the Act. (Section 110(a)(2)(C) through (H), 42 U.S.C. § 1857c-5(a)(2)(C) through (H).)
 
 
 11
 Within four months after the date a state plan was required to be submitted, the Administrator was required to review the plan to determine whether it satisfied the statutory requirements and to approve or disapprove the plan or each portion thereof. (Section 110(a), 42 U.S.C. § 1857c-5(a).) If the Administrator determined that a state's plan or any portion thereof did not satisfy the statutory requirements, he was to disapprove the plan, or the offending portion thereof, and, within six months after the date the plan was required to be submitted, promulgate his own implementation plan or portion thereof for that state. (Section 110(c)(1), 42 U.S.C. § 1857c-5(c)(1).)
 
 Significant Deterioration Regulations
 
 12
 During the period he was reviewing state plans, the Administrator questioned his authority to require those plans to protect against "significant deterioration" of air quality in areas in which the air was cleaner than required by the national standards, when that significant deterioration would not result in pollution violative of the national standards. He took the position that he would not demand such provisions in state plans. See Sierra Club v. Ruckelshaus, 344 F.Supp. 253, 254 (D.D.C.1972), aff'd per curiam, 4 E.R.C. 1815 (D.C.Cir.1972), aff'd by an equally divided Court sub nom., Fri v. Sierra Club, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973). In the Sierra Club case the court held, on motion for preliminary injunction, that the Administrator had a non-discretionary duty to protect the air quality from significant deterioration and issued a preliminary injunction prohibiting him from approving state plans "which allow pollution levels of clean air to rise to the secondary level of pollution." 344 F.Supp. at 256.[1] The court ordered the Administrator to promulgate proposed significant deterioration regulations within six months as to any state plan which permitted or failed to take measures sufficient to prevent significant deterioration. 2 E.L.R. 20262, 20263.
 
 
 13
 As a result of that decision, the Administrator again reviewed all state implementation plans and disapproved them to the extent that they failed to prevent significant deterioration of air quality. (40 C.F.R. § 52.21 (1974), 37 Fed.Reg. 23,836 (Nov. 9, 1972).) One of the plans affected was that of Illinois, which had been submitted to the Administrator on January 31, 1972, and given partial approval on May 26, 1972. (40 C.F.R. § 52.722 (1974), 37 Fed.Reg. 10,842 (May 31, 1972).) In response to his duty under the court's order in the Sierra Club case the Administrator proposed (38 Fed.Reg. 18,986 (July 16, 1973)) and reproposed (39 Fed.Reg. 31,000 (Aug. 27, 1974)) rules on the prevention of significant air quality deterioration. Eventually he promulgated regulations for two of the six air pollutants for which he had earlier promulgated national ambient air quality standards under his statutory duty.[2] (39 Fed.Reg. 42,510 (Dec. 5, 1974).) These regulations are intended to prevent significant deterioration in the quality of air for two pollutants, particulate matter and sulfur dioxide, by limiting increases in the concentrations of those pollutants in areas where the present level of pollution is less than required by the national ambient air quality standards. This is to be accomplished by dividing those areas in which the level of pollution does not presently exceed the national ambient air quality standards into three classes in which increases in concentration of the two pollutants are limited by different amounts. The Administrator originally classified all areas, but the states, after a public hearing and subject to other requirements, may submit to the Administrator proposals for reclassification of areas. No final regulations have been promulgated for the other four pollutants as of yet. The Administrator, therefore, has not yet complied with the Sierra Club order.
 
 Indirect Source Regulations
 
 14
 When the Administrator gave partial approval to the Illinois implementation plan on May 26, 1972, he also granted to Illinois, as he did to a number of other states, extensions until February 15, 1973, to submit the transportation portion of its implementation plan. Several other states were given until mid-1977 to attain the national primary standards. (37 Fed.Reg. 10,842 (May 31, 1972).) The Court of Appeals for the District of Columbia, on a petition for review, held that this extension was not authorized by the Act, and also found that the record did not show whether the Administrator had conducted a state-by-state determination on the efficacy of the state plans to provide for the maintenance of the primary and secondary standards beyond May 31, 1975. National Resources Defense Council, Inc. v. EPA, 154 U.S.App.D.C. 384, 475 F.2d 968, 970, 971-972 (1973). The court established a new time schedule under which the Administrator was to review the maintenance provisions of the state plans and disapprove those which he determined did not contain sufficient measures for maintenance of the primary standard. (Id. at 972.) In this re-examination, the Administrator found that none of the state plans, including that of Illinois, contained adequate provisions for insuring the maintenance of national standards, but granted the states another opportunity to develop adequate programs. (40 C.F.R. § 52.22(a) (1974), 38 Fed.Reg. 6280 (March 8, 1973).)The Administrator, pursuant to the order of the Court of Appeals for the District of Columbia in Natural Resources Defense Council, Inc. v. EPA, then promulgated regulations to insure the maintenance of national standards by requiring state implementation plans to contain procedures for review of any new stationary source or modification that might "interfere with attainment or maintenance of a standard either directly because of emissions from it, or indirectly, because of emissions resulting from mobile source activities associated with it." (40 C.F.R. § 51.18 (1974), 38 Fed.Reg. 15,834, 15,836 (June 18, 1973).) He suggested guidelines to assist the states in complying with the requirements of section 51.18. (See Appendix 0 to 40 C.F.R. § 51.18.)
 
 
 15
 The Administrator was also required by National Resources Defense Council, Inc. v. EPA, to promulgate indirect source review regulations if states either failed to submit such regulations on their own or submitted inadequate regulations. (475 F.2d at 971.) In response to that requirement the Administrator proposed regulations (38 Fed.Reg. 29,893 (Oct. 30, 1973)), and, after public hearings in 43 states, promulgated them. (40 C.F.R. § 52.22 (1974), 39 Fed.Reg. 7270 (Feb. 25, 1974).) He also determined that since the plans of most states, including Illinois, contained inadequate provisions for review of indirect sources as required by section 51.18, the provisions of section 52.22(b) would be incorporated by reference and made a part of each of those plans. (See, e. g., 40 C.F.R. § 52.736 (1974).)
 
 
 16
 An indirect source is defined by the regulation as "a facility, building, structure, or installation which attracts or may attract mobile source activities that results in emissions or a pollutant for which there is a national standard," for example a "(p)arking facility." (40 C.F.R. § 52.22(b)(i) (1974).) The regulation applies to any indirect source on which construction or modification is to commence after December 31, 1974. The Administrator later amended the indirect source regulations in respects not material here. (39 Fed.Reg. 25,292 (July 9, 1974).)
 
 The Motion to Dismiss the Appeal
 
 17
 A motion by the defendants who are the developers of the shopping center to dismiss the appeal in No. 74-1271 against them and a prospective tenant was taken under advisement with the case. These defendants argue that a 1974 amendment to the Clean Air Act (42 U.S.C. §§ 1857c-5(c)(2)(C), (D)) and the promulgation of indirect source regulations moot Count I, the only part of the case concerning them, and that no case or controversy between them and the plaintiffs is raised in the plaintiffs' briefs because of failure to comply with Rule 28(a)(5), Fed.R.App.P., which requires a short statement of the relief sought. The mootness ground is without merit, because plaintiffs seek in Count I not only promulgation of indirect source regulations, but also an injunction against construction of the shopping center until proper regulations have been promulgated. Since the developer defendants and the tenant defendants were necessary parties in a claim seeking such an injunction, the case is not moot as to them. The failure to state the relief sought against these defendants is not a basis for dismissal of the appeal as to them in the circumstances of this case. We therefore deny the motion to dismiss and turn to the merits of the appeal.
 
 Counts I and II: The Regulations
 
 18
 In Count I of their complaint plaintiffs allege that the Administrator has been in violation of the provisions of the Act requiring him to issue two kinds of regulations: (a) significant deterioration regulations, preventing the significant deterioration of air quality in areas with air cleaner than national standards (as stated above, such regulations as to two of the six pollutants in question have now been promulgated); and (b) indirect source regulations, preventing violations of the national air quality standards by indirect sources (as stated above, these regulations have now been promulgated). They seek an order requiring him to promulgate those regulations and to halt further construction of the shopping center until its plans have been reviewed by the Administrator under both sets of regulations he is required to promulgate. In Count II the plaintiffs reallege that the Administrator has been in violation of his statutory duty to promulgate significant deterioration and indirect source regulations. In this count, however, they seek to halt construction of the Lake-Cook Road expansion and improvement project until its plans have been reviewed by the Administrator under both sets of regulations. To facilitate understanding of our analysis, we will divide our discussion of plaintiffs' claims by considering separately plaintiffs' rights to obtain promulgation of the two sets of regulations rather than by considering separately Counts I and II of their complaint
 
 Review of the Indirect Source Regulations
 
 19
 The Administrator having promulgated indirect source regulations after the complaint was filed, plaintiffs' grievance now is that those regulations exempt indirect sources on which construction was commenced before January 1, 1975, as it was on the shopping center involved in this case.
 
 
 20
 Section 307(b)(1) of the Amendments, 42 U.S.C. § 1857h-5(b)(1), provides in pertinent part:
 
 
 21
 "A petition for review of the Administrator's action in . . . promulgating any implementation plan under section 1857c-5 of this title (section 110 of the Amendments) . . . may be filed only in United States Court of Appeals for the appropriate circuit."
 
 
 22
 The indirect source regulations are subject to this section. Entitled "Review of Indirect Sources" (39 Fed.Reg. 7270-7285 (Feb. 25, 1974)), they purport to be promulgated pursuant to section 110, 42 U.S.C. § 1857c-5. It is so stated in the Administrator's comments in the first part of the regulations. Furthermore, the regulations contain the subtitle, "Approval and Promulgation of Implementation Plans," which is the statutory language used in section 307. The regulations set out the national standards for regulation of indirect sources, disapprove various parts of state implementation plans, and incorporate the federal standards into those plans. For example, Subpart O deals with Illinois and provides:
 
 
 23
 "Subpart O-Illinois
 
 
 24
 "25. Subpart O is amended by adding § 52.736 as follows:
 
 
 25
 " § 52.736 Review of new sources and modifications.
 
 
 26
 "(a) The requirements of § 51.18 of this chapter are not met because the State failed to submit a plan for review of new or modified indirect sources.
 
 
 27
 "(b) Regulation for review of new or modified indirect sources. The provisions of § 52.22(b) of this chapter are hereby incorporated by reference and made a part of the applicable implementation plan for the State of Illinois." 39 Fed.Reg. at 7281.
 
 
 28
 Since the regulations incorporate the federal standards into the state plans, the Administrator is in effect promulgating implementation plans where state plans are deficient, in accordance with section 110(c) (42 U.S.C. § 1857c-5), which is to be reviewed only under section 307(b)(1) (42 U.S.C. § 1957h-5(b) (1)).
 
 
 29
 Other courts of appeals have held under analogous circumstances that a petition for review under section 307(b)(1) is the exclusive method of review. In Getty Oil Co. v. Ruckelshaus, 467 F.2d 349, 355-356 (3d Cir. 1972), cert. denied, 409 U.S. 1125, 93 S.Ct. 937, 35 L.Ed.2d 256 (1973), the court refused to permit, in an action filed in the district court, what amounted to an attack on the compliance date in regulation in the Delaware plan limiting the amount of sulfur content in burning fuel, holding that the sole remedy was a petition for review to the court of appeals under section 307(b)(1). Also supporting the rule that a petition under that section is the sole remedy for reviewing the promulgation or implementation of clean air plans and regulations are Plan for Arcadia, Inc. v. Anita Associates, 501 F.2d 390, 392 (9th Cir. 1974), cert. denied, 419 U.S. 1034, 95 S.Ct. 517, 42 L.Ed.2d 309 (1974); and Anaconda Co. v. Ruckelshaus, 482 F.2d 1301, 1304 (10th Cir. 1973). One district court decision is squarely in point, Pinkney v. Ohio Environmental Protection Agency, 375 F.Supp. 305, 309 (N.D.Ohio 1974), in which the alternative ground for dismissal of a challenge to the 180-day delay in the effective date of the indirect source regulations was that the exclusive remedy was a petition for review under section 307(b)(1). Similarly, in Delaware Citizens for Clean Air, Inc. v. Stauffer Chemical Co., 367 F.Supp. 1040, 1046 (D.Del.1973), the court refused, on the same ground, to entertain an action to challenge a state-granted variance from compliance with a sulfur dioxide emission regulation, which the Administrator had treated as a deferral of compliance amounting to a revision of the state implementation plan and approved as such. See West Penn Power Co. v. Train, 378 F.Supp. 941, 944-945 (W.D.Pa.1974); cf. Luneburg and Roselle, Judicial Review Under the Clean Air Amendments of 1970, 15 B.C.Ind. & Com.L.Rev. 667, 691 n. 145 (1974).
 
 
 30
 Plaintiffs attempt to characterize the regulations' exemption of any facility on which construction was started before January 1, 1975 as a failure to promulgate regulations with respect to such facilities. We think, however, that a provision defining the scope of regulations and their effective date is as much a part of the regulations as the substantive parts.
 
 
 31
 The explanations contained in the regulations for the exemption clause are "recent firm congressional guidelines contained in amendments to the Clean Air Act," compelling administrative reasons, and the need to minimize disruptive effects on industry. (39 Fed.Reg. at 7272-7273.) A review of the sufficiency of these reasons requires an examination of the administrative record, which is not before us now but would be if this were a petition for review.
 
 
 32
 The exemption provision is an integral part of the regulations and, like any other part, must be reviewed in a petition for review. It cannot be reviewed by an action filed in the district court.
 
 
 33
 Plaintiffs have in fact filed a separate petition for review of the indirect source regulations in this court (No. 74-1231), and that petition, together with others filed in various other circuits attacking the indirect source regulations, has been transferred on the EPA's motion to the Court of Appeals for the District of Columbia (No. 74-1595 in that court). Their contentions concerning the validity of the exemption provision will presumably be
 
 
 34
 determined in that litigation. The Failure to Promulgate
 
 Significant Deterioration Regulations for
 Automobile-Related Pollutants
 
 35
 Regulations for two air pollutants, particulate matter and sulfur dioxide, having been promulgated after the complaint was filed (see note 2, supra ), plaintiffs now seek to require the Administrator to promulgate regulations for carbon monoxide and the other automobile-related pollutants for which he had established national ambient air standards.
 
 
 36
 As the District Court pointed out, the Administrator has already been ordered in Sierra Club v. Ruckelshaus, supra, to promulgate significant deterioration regulations. Counsel for the government, in their brief in this court, represented that the Administrator had complied with this order, and "(t) herefore, since the significant deterioration regulations have already been published, the issue of any prior failure to promulgate them is rendered moot." Because, as is apparent from the regulations and the Administrator's introductory statement accompanying them (39 Fed.Reg. 42,510 (Dec. 5, 1974)), and as counsel for the government acknowledged during oral argument, the regulations that have been promulgated relate to only two of the six identified pollutants, the case is not moot as to this point. Whether there is a need for a second order against the Administrator to do that which he has already been ordered to do in the Sierra Club case is a question we need not reach, because we find that this claim is not maintainable by plaintiffs at this time.
 
 
 37
 Section 304(a) of the Amendments, 42 U.S.C. § 1857h-2(a), provides in pertinent part as follows:
 
 
 38
 "Except as provided in subsection (b) of this section, any person may commence a civil action on his own behalf
 
 
 39
 "(2) against the Administrator where there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator."
 
 
 40
 Subsection (b), 42 U.S.C. § 1857h-2(b), imposes the following limitation upon this right to sue:
 
 
 41
 "No action may be commenced
 
 
 42
 "(2) under subsection (a)(2) of this section prior to 60 days after the plaintiff has given notice of such action to the Administrator . . . ."[3]
 
 
 43
 Plaintiffs failed to give the Administrator sixty days notice prior to commencing suit, which the District Court held was fatal to its jurisdiction under section 304. The court reasoned that the purpose of the sixty-day notice requirement was to give the Administrator time to assess and respond to difficult, multi-count lawsuits, to deploy attorneys from Washington, if necessary, and to arrange for the on-going process of regulatory development and other substantive EPA concerns despite the interruption caused by a pending lawsuit. The statute's sixty-day notice requirement would be nullified, said the court, if plaintiffs were required to do nothing more than comply with Fed.R.Civ.P. 12(a), which grants the United States, or an officer or employee thereof, sixty days in which to answer a complaint in any civil suit. City of Highland Park v. Train, supra, 374 F.Supp. at 766-767. In accord with the District Court's holding are Pinkney v. Ohio Environmental Protection Agency, supra, 375 F.Supp. at 308, and West Penn Power Co. v. Train, supra, 378 F.Supp. at 944. Cf. Metropolitan Washington Coalition for Clean Air v. District of Columbia, 373 F.Supp. 1089, 1092 (D.D.C.1974).[4] Contra, Riverside v. Ruckelshaus, 4 E.R.C. 1728 (C.D.Cal.1972).[5]
 
 
 44
 The legislative history of section 304 shows Congress's determination that citizen participation in the enforcement of standards and regulations under the Clean Air Act of 1970 be established. It also shows, however, that Congress intended to provide for citizens' suits in a manner that would be least likely to clog already burdened federal courts and most likely to trigger governmental action which would alleviate any need for judicial relief. It was in response to these concerns that the statutory notice provisions were included in section 304.[6] Congress's intention would be frustrated if the statutory mandate of section 304(b) were ignored.[7]
 
 
 45
 The language chosen by Congress makes it clear that the Administrator is to be given notice in addition to that required by Rule 12(a), Fed.R.Civ.P., which allows him sixty days to answer or move against a complaint by which an action is commenced. Section 304(b)'s statutory command plainly states that "(n)o action may be commenced . . . prior to 60 days after the plaintiff has given notice of such action to the Administrator." (Emphasis supplied.) Plaintiffs made no attempt whatsoever to comply with the notice provision, and their suit therefore could not properly be commenced.
 
 
 46
 Alternatively, plaintiffs argue that other remedies are available. The first of these is statutory mandamus, 28 U.S.C. § 1361, which provides that "district courts shall have original jurisdiction of any action in the nature of a mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."
 
 
 47
 Among the courts and legal scholars there have been repeated efforts to ascertain the precise scope and limitations of section 1361.[8] For purposes of the present case, however, we need not be concerned with defining the jurisdictional reach of that section. However broad its scope, mandamus cannot be invoked to require the District Court to order the Administrator to promulgate significant deterioration regulations.
 
 
 48
 The traditional principles generally recognized as controlling the issuance of a writ of mandamus were concisely stated by the court in Lovallo v. Froehlke, 468 F.2d 340, 343 (2d Cir. 1972), cert. denied, 411 U.S. 918, 93 S.Ct. 1555, 36 L.Ed.2d 310 (1973), as follows:
 
 
 49
 "(1) a clear right in the plaintiff to the relief sought; (2) a plainly defined and peremptory duty on the part of the defendant to do the act in question; and (3) no other adequate remedy available."
 
 
 50
 See also United States ex rel. Girard Trust Co. v. Helvering, 301 U.S. 540, 543-544, 57 S.Ct. 855, 81 L.Ed. 1272 (1937).
 
 
 51
 There is, as we have seen, another remedy available, that provided in section 304(a)(2) of the Clean Air Amendments of 1970, which affords any person a direct remedy to compel the Administrator to perform a nondiscretionary duty. Plaintiffs have not shown that the necessity of complying with the notice provision rendered that remedy inadequate in this case.
 
 
 52
 It is, accordingly, unnecessary for us to reach the question of whether there exists that "plainly defined" duty (Lovallo v. Froehlke, supra, 468 F.2d at 343), the performance of which is positively commanded and so plainly prescribed as to be free from doubt (United States v. Walker, 409 F.2d 477, 481 (9th Cir. 1969)), that is necessary to warrant the issuance of a writ of mandamus. We do note that the matter was doubtful enough to cause the Administrator, whose expertise in interpreting the statute is entitled to weight, to conclude that the duty did not exist and to cause the Supreme Court in the Sierra Club case to divide equally on the question of whether he was right. But cf. Roberts v. United States, 176 U.S. 221, 231, 20 S.Ct. 376, 44 L.Ed. 443 (1899).
 
 
 53
 Plaintiffs also argue that the District Court had jurisdiction to grant the relief requested against the Administrator under 28 U.S.C. § 1331, the general federal question statute, and the revised Administrative Procedure Act, 5 U.S.C. §§ 702-705.
 
 
 54
 Until the mandamus statute, 28 U.S.C. § 1361, was adopted in 1962, the federal district courts did not have mandamus jurisdiction, Covington & Cincinnati Bridge Co. v. Hager, 203 U.S. 109, 27 S.Ct. 24, 51 L.Ed. 111 (1906), except in the District of Columbia, Fagan v. Schroeder, 284 F.2d 666, 668 (7th Cir. 1960), where it existed through historical accident. S.Rep.No.1992, 87th Cong., 2d Sess. (1962), reprinted in 1962 U.S.Code Cong. & Admin.News, p. 2784 et seq. Section 1361 was adopted to remedy this deficiency and give mandamus jurisdiction to district courts outside the District of Columbia. (Id. ) In light of this history, it might be questioned whether relief in the nature of mandamus should be granted in an action in which subject matter jurisdiction is based on section 1331.[9] Assuming, however, that the equivalent of mandamus is available through the court's equity powers, the existence of another adequate remedy would still preclude relief. This is not the kind of case in which it would be appropriate for federal courts to "adjust their remedies so as to grant the necessary relief" for the invasion of federally protected rights. Cf. Bell v. Hood, 327 U.S. 678, 684, 66 S.Ct. 773, 90 L.Ed. 939 (1946). There is no need for a new remedy, because, as we have said, an adequate statutory remedy for protecting rights of the kind asserted by plaintiffs is provided by the very statute that creates the rights.
 
 
 55
 The revised Administrative Procedure Act, insofar as pertinent here, defines agency action which is subject to judicial review under that act as "Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court . . . ." 5 U.S.C. § 704. Here, as we have held, there is the "other adequate remedy in a court," provided by section 304 of the Clean Air Amendments of 1970, and, while that statute makes the Administrator's failure to promulgate regulations reviewable, it does so subject to a condition which has not been met here, compliance with the notice requirement. The agency action here is "made reviewable by statute" only if the condition is met.
 
 
 56
 In Natural Resources Defense Council, Inc. v. Train, 510 F.2d 692, 698-703 (D.C.Cir.1975), the majority held that under the Federal Water Pollution Control Act, the pertinent provisions of which are substantially the same as those of the Clean Air Act, judicial review could be obtained under the Administrative Procedure Act, 5 U.S.C. § 704, and, apparently, under 28 U.S.C. § 1331 also, and refers to the Clean Air Act and its legislative history as a basis for its holding. The majority's opinion does not contain a discussion of the meaning of the phrase "made reviewable by statute" in 5 U.S.C. § 704, but bases its holding on the saving provision of the Federal Water Pollution Control Act, 33 U.S.C. § 1365(e), which is substantially the same as the saving provision in section 304 of the Clean Air Amendments of 1970, 42 U.S.C. § 1857h-2(e), and the statements in the legislative history that other remedies were not impaired by the act. The opinion does not give any reasons for the court's apparent holding that jurisdiction was also conferred by 28 U.S.C. § 1331. Judge Robb's dissent argues that the 60-day notice requirement should control. (510 F.2d at 730-731.) With deference, we believe that the saving provision, expressing the general intention of Congress not to disturb existing rights to seek relief, does not have the affirmative effect of removing conditions which existing law imposes upon the exercise of those rights. We conclude, for the reasons stated above, that the conditions imposed by existing law upon the right to seek relief under either 28 U.S.C. § 1331 or 5 U.S.C. § 704 have not been met. We are not holding that if the remedy provided by the statute were inadequate in the circumstances of a particular case, other remedies would be unavailable.[10]
 
 
 57
 The final additional basis for jurisdiction alleged in the complaint, but not urged here, is the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202. While the availability of another remedy does not preclude declaratory relief, a court may properly decline to assume jurisdiction in a declaratory action when the other remedy would be more effective or appropriate (6A J. Moore, Federal Practice P P 57.08(3), 57-43 (2d ed. 1974)), as we find to be the case here.
 
 Disposition as to Counts I and II
 
 58
 Since neither judicial review of the indirect source regulations nor mandatory relief to compel the promulgation of significant deterioration regulations for pollutants related to automobiles is available in the proceedings before us, there is no basis in the allegations of Counts I and II for plaintiffs' demand for an injunction against further construction on the highway expansion and the shopping center until their claims concerning these regulations are finally resolved. We cannot find at this stage a sufficient likelihood that regulations entitling plaintiffs to such injunctive relief will ultimately be promulgated to justify an award of injunctive relief. We therefore affirm the dismissal of Counts I and II.
 
 
 59
 Count III: Absence of an Environmental Impact Statement
 
 
 60
 Plaintiffs allege in Count III that portions of the expansion of Lake-Cook Road are to be constructed with federal funds, and that the United States Department of Transportation was therefore required by the National Environmental Policy Act of 1969 ("NEPA," 42 U.S.C. § 4321 et seq.) to prepare an environmental impact statement concerning the expansion, which has not been prepared. They seek an order requiring the preparation of such a statement and an injunction prohibiting the construction of the improvements on the road by Cook County Department of Highways until the statement is prepared. The motions to dismiss by the defendants under this count were supported and opposed by affidavits and documents, and therefore were treated by the District Court, under the authority of Rule 12(c), Fed.R.Civ.P., as motions for summary judgment. The court granted the motions.
 
 
 61
 Plaintiffs now question the propriety of deciding the issues under Count III by a summary judgment. They appear not to have raised this question when they submitted matter outside the pleadings in opposition to the motions, and did not suggest in their papers in opposition in the District Court the existence of any other evidence bearing on the issues. They had ample opportunity to present all material pertinent to the motion. The court properly determined that there was no genuine issue as to any material fact.
 
 
 62
 NEPA requires each federal agency, before taking any "major Federal actions significantly affecting the quality of the human environment," to prepare a "detailed statement" analyzing, among other things, "the environmental impact of the proposed action." (42 U.S.C. § 4332(2)(C).) "Actions" include projects supported in whole or in part by federal funding. (40 C.F.R. § 1500.5(a)(2) (1974).) Plaintiffs contend that federal funding has been requested for a 2.47 mile segment of the Lake-Cook Road, and that therefore the requirements of NEPA are applicable to the entire road expansion project.
 
 
 63
 The documentary evidence submitted below indicates that the 2.47 mile segment of the road has received "federal-aid secondary system" designation. Designation, however, is merely the first step in the procedure for obtaining federal funds for highway improvement. The Federal-Aid Highway Acts indicate that before federal funding is obtained the project must be programmed by a state agency for federal funding and then approved by both the state highway department and federal authorities. (23 U.S.C. §§ 103(c), (f), 105, and 106.) It is undisputed that this designation was made long before the enactment of NEPA, and there is accordingly no basis for a contention that the road improvement project was segmented to circumvent the Act. See River v. Richmond Metropolitan Authority, 359 F.Supp. 611, 633-636 (E.D.Va.1973), aff'd per curiam, 481 F.2d 1280 (4th Cir. 1973).
 
 
 64
 Plaintiffs submitted, in opposition to the motion, documents which they contend prove that federal funds have been applied for. They consist of a letter from the County Department of Transportation transmitting a county resolution to have Federal Aid Secondary Route ("FAS") 122 (the approximately .5 mile segment between Pfingston and Waukegan Roads) programmed for federal funding; the resolution itself; the Illinois Department's letter to the County Department approving the resolution; a similar set of letters and a resolution concerning FAS 1013 (the approximately 2 mile segment between Sanders and Pfingston Roads); and a document entitled "Draft/Combined Corridor and Design Environment Statement/Administrative Action for Federal Aid Secondary Routes 1013 & 122," which is not signed and has "Preliminary 11/16/73" written across it. These documents give no indication of federal involvement up to that point in the approval process. Defendants submitted affidavits showing that there has been no programming by the State of Illinois for federal funding of the Lake-Cook Road improvement project, and that no application for federal funds has been made. Counsel for the Cook County Department of Highways represented at oral argument that these facts were unchanged.
 
 
 65
 Thus the documents relied on by plaintiffs show nothing more than a possibility that federal funds might be applied for. The affidavits establish that no federal funds have in fact been applied for.
 
 
 66
 One case sustained a preliminary injunction against construction of a highway project for failure to comply with a federal relocation statute,[11] holding that the project for a part of the federal-aid primary system became a federal-aid highway project for purposes of that statute when it received location approval[12] prior to any application for federal funds. La Raza Unida v. Volpe, 488 F.2d 559 (9th Cir. 1973), cert. denied, 417 U.S. 968, 94 S.Ct. 3171, 41 L.Ed.2d 1138 (1974). That case was not decided under NEPA, which applies to proposed major federal actions and not to a federal-aid secondary designation that took place long before NEPA was adopted or to possible federal funding that is not proposed at present. And, as the district court in River v. Richmond Metropolitan Authority, supra, stated: "Notwithstanding the fact that La Raza Unida declared a highway project to be federal early in the planning process, it most assuredly did not hold that a project could be federal where no federal participation had ever taken place." 359 F.Supp. at 634. Possible future federal funding is all that the plaintiffs in the case at bar have shown.
 
 
 67
 The Lake-Cook Road improvement appears from the summary judgment papers to be a state project on which no federal action is proposed, and therefore, NEPA's requirement of an environmental impact statement does not apply to the project. See Citizens for Balanced Environment and Transportation, Inc. v. Volpe, 503 F.2d 601 (2d Cir. 1974); Civic Improvement Committee v. Volpe, 459 F.2d 957 (4th Cir. 1972); cf. Bradford Township v. Illinois State Toll Highway Authority, 463 F.2d 537, 540 (7th Cir. 1972), cert. denied, 409 U.S. 1047, 93 S.Ct. 518, 34 L.Ed.2d 499 (1972).
 
 
 68
 Count IV: The Equal Protection Challenge to the Zoning Ordinance
 
 
 69
 Plaintiffs allege in amended Count IV that the Village of Northbrook and its trustees have deprived them of the equal protection of the laws as guaranteed by the Fourteenth Amendment and seek a judgment declaring invalid Northbrook's zoning approval of the proposed shopping center complex and an injunction "barring future zoning approval until Northbrook demonstrates that its residents have been subjected to similar environmental assaults." Jurisdiction is purportedly predicated upon 28 U.S.C. § 1331 (federal question); 28 U.S.C. § 2201 (declaratory judgment remedy); and 42 U.S.C. § 1983 (deprivation of constitutional or federal statutory rights under color of state law), and its jurisdictional correlative, 28 U.S.C. § 1343.
 
 
 70
 Plaintiffs allege in substance that, upon information and belief, Northbrook and its trustees have "aggressively protected" its residential areas from intrusion by massive commercial developments such as the proposed shopping center complex; that their action in giving zoning approval to the proposed shopping center complex will cause the eventual subjection of plaintiffs to "vast increase in noise and air pollution as well as aesthetic destruction of the quiet residential character of their community;" and that by exposing plaintiffs to these environmental hazards, while protecting Northbrook residents from intrusion of similar developments, Northbrook has discriminated against them in violation of the Fourteenth Amendment. The amendment to the complaint, in which plaintiffs joined the trustees of the Village of Northbrook as additional defendants, did not specify any relief sought against them. The village and the trustees moved to dismiss Count IV of the complaint for want of jurisdiction as to it under 42 U.S.C. § 1983 and for failure to state a claim for which relief could be granted.
 
 
 71
 As the District Court correctly held (City of Highland Park v. Train, supra, 374 F.Supp. at 773), there is no jurisdiction under 42 U.S.C. § 1983 over the claim against the village. City of Kenosha v. Bruno,412 U.S. 507, 513, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973). Assuming the existence of jurisdictional amount, we have jurisdiction against the village on the claim based upon the Fourteenth Amendment under 28 U.S.C. § 1331. The absence of any specific request for relief against the trustees may have justified dismissal as to them, but in any event the complaint, as amended, states no claim on which relief could be granted against either the trustees or the village.
 
 
 72
 A zoning ordinance is clothed with every presumption of validity. City of Ann Arbor, Mich. v. Northwest Park Constr. Corp., 280 F.2d 212, 223 (6th Cir. 1960). Derived from the states' police power, the legislative authority which grants municipalities the power to adopt and enforce zoning ordinances and regulations is not to be narrowly confined. Village of Belle Terre v. Boraas, 416 U.S. 1, 5-8, 94 S.Ct. 1536, 39 L.Ed.2d 797 (1974); cf. Berman v. Parker, 348 U.S. 26, 32-33, 75 S.Ct. 98, 99 L.Ed. 27 (1954). Unless it is based upon a suspect classification or impinges upon a fundamental right (see Village of Belle Terre v. Boraas, supra, 416 U.S. at 6, 7, 94 S.Ct. 1536), which is not true in the case at bar, zoning legislation may be held unconstitutional only if it is shown to bear no possible relationship to the state's interest in securing the health, safety, morals, or general welfare of the public and is, therefore, manifestly unreasonable and arbitrary. E. g., Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395, 47 S.Ct. 114, 71 L.Ed. 303 (1926); Gorieb v. Fox, 274 U.S. 603, 610, 47 S.Ct. 675, 71 L.Ed. 1228 (1927); Aquino v. Trobiner, 298 F.2d 674, 677, 112 U.S.App.D.C. 13 (1961). Thus the scope of judicial review is limited.
 
 
 73
 It is well established that "(i)n the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its law are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because . . . 'in practice it results in some inequality.' " Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1960); see Village of Belle Terre v. Boraas, supra, 416 U.S. at 8, 94 S.Ct. 1536; Sinclair Refining Co. v. City of Chicago, 178 F.2d 214, 217 (7th Cir. 1950). As the Supreme Court observed in Village of Euclid v. Ambler Realty Co., supra : "(L)aws may . . . find their justification in the fact that, in some fields, the bad fades into the good by such insensible degrees that the two are not capable of being readily distinguished and separated in terms of legislation." (272 U.S. at 389, 47 S.Ct. at 118.)
 
 
 74
 Inherent in all zoning legislation are statutory distinctions which give rise to claims of disparity of treatment. Inevitably areas zoned for nonresidential uses will touch areas zoned for residential uses, and the burden of the zoning always falls most heavily on the residents adjacent to the boundary. This is essentially all that plaintiffs have alleged here, except that they have framed their grievance in the rhetoric of equal protection.
 
 
 75
 Plaintiff residents of Highland Park and Glenbrook Countryside allege no classification other that the distinction between residents in close proximity to the proposed shopping center and residents who live farther away. Such a classification, inherent in all zoning, is not within the purview of the Fourteenth Amendment. Cf. L'Hote v. City of New Orleans, 177 U.S. 587, 597, 20 S.Ct. 788, 792, 44 L.Ed. 899 (1899). "Some must suffer by the establishment of any territorial boundaries. . . . If these limits hurt the (appellants), other limits would hurt others." (Id.) So long as such legislation applies equally to all persons similarly situated in a given locale, there can be no violation of the Equal Protection Clause. Cf. Caskey Baking Co. v. Virginia, 313 U.S. 117, 121, 61 S.Ct. 881, 85 L.Ed. 1223 (1941); United States v. Holmes, 387 F.2d 781, 785 (7th Cir. 1967), cert. denied, 391 U.S. 936, 88 S.Ct. 1835, 20 L.Ed.2d 856 (1968).
 
 
 76
 Zoning is not rendered unconstitutional by the fact that any direct benefit the plaintiffs may receive from it is less than the possible burdens it may impose upon them. Plaintiffs having failed in Count IV to state a claim upon which relief can be granted, the District Court's dismissal of that count is affirmed.
 
 The Petition for Review
 
 77
 On January 6, 1975, plaintiffs filed in this court a petition for review, No. 75-1006, seeking review of the significant deterioration regulations promulgated by the Administrator on December 5, 1974. That petition which states as petitioners' sole grievance the Administrator's failure to promulgate significant deterioration regulations with respect to carbon monoxide and other automobile related pollutants was consolidated with No. 74-1271 on the representation by petitioners that the same substantive issues were involved in the two cases, the court viewing the petition for review as an attempt by petitioners to "safeguard their jurisdictional grounds." (Order of February 11, 1975, denying motion to reconsider consolidation.)
 
 
 78
 No brief has been submitted in support of the petition for review. We therefore do not have the benefit of petitioners' views as to the appropriateness of a petition for review to compel the Administrator to act. We think, however, that the function of a petition for review is to invoke a review for correctness by the Court of Appeals of regulations adopted by the Administrator and not to compel the Administrator to act when he has failed to act. Petitioners, in their petition for review, do not challenge the significant deterioration regulations on particulate matter and sulfur dioxide which the Administrator has promulgated. Their petition rather complains that the Administrator "continues in his failure" to promulgate regulations relating to carbon monoxide and other motor vehicle related pollutants. The appropriate procedure for compelling the Administrator to act is that provided in section 304(a), supra, which expressly provides for an action in the district court "against the Administrator when there is alleged a failure of the Administrator to perform any act or duty under this Act which is not discretionary with the Administrator." Plaintiffs recognized this when they brought their action under section 304(a), but they failed to give statutory notice that would have made their action viable. The petition for review is dismissed.
 
 
 79
 Affirmed in No. 74-1271; Petition for Review dismissed in No. 75-1006.
 
 
 
 [1]
 See also Natural Resources Defense Council, Inc. v. Train, 489 F.2d 390, 408 (5th Cir. 1974), rev'd on other grounds, supra, --- U.S. ---, 95 S.Ct. 1470, 43 L.Ed.2d 731; Exxon Corp. v. City of New York, 372 F.Supp. 335, 339 (S.D.N.Y.1974)
 
 
 [2]
 The six pollutants originally identified were sulfur dioxide, particulate matter, carbon monoxide, photochemical oxidants, hydrocarbons, and nitrogen dioxide. (40 C.F.R. §§ 50.4-50.11 (1974).) The original proposed rules referred to in the text broadened "nitrogen dioxide" to "nitrogen oxide" and omitted photochemical oxidants, apparently because they are formed from hydrocarbons and nitrogen dioxides and do not exist otherwise, and therefore do not require separate treatment. This part of the proposed rules required only that the best possible technology be used
 
 
 [3]
 The statute also specifies certain exceptions to this notice requirement that are not applicable here
 
 
 [4]
 The Metropolitan Washington Coalition case is consistent, in our view, with the holding of Pinkney and West Penn Power Co. The plaintiffs in Metropolitan Washington Coalition, although they failed to give the required sixty-day notice before filing their first complaint, filed a subsequent complaint raising the same issues more than sixty days after the service of the first. This, as the court held, in substance afforded the Administrator the sixty-day notice to which he was entitled under section 304(b)
 
 
 [5]
 In response to the Administrator's argument that plaintiffs' failure to comply with the statutory notice requirement of section 304(b)(2) barred jurisdiction under the Clean Air Act, the Riverside court found that personal service on the Administrator coupled with a lapse of sixty days between the date of filing the complaint and the date of completion of a hearing on plaintiff's request for a preliminary injunction, amounted to "substantial compliance" with the sixty-day notice requirement and gave the Administrator "the beneficial effect" of the requirement. (4 E.R.C. at 1731.)
 
 
 [6]
 See S.Rep.No.1196, 91st Cong., 2d Sess., 36-39 (1970), reproduced at 116 Cong.Rec. 32926-27 (1970); 116 Cong.Rec. 33102-03 (1970); Conf.Rep. No. 19-178, 91st Cong., 2d Sess., U.S.Code Cong. & Admin.News, pp. 5374, 5388 (1970)
 
 
 [7]
 See Steinberg, Is the Citizen Suit a Substitute for the Class Action in Environmental Litigation? An Examination of the Clean Air Act of 1970 Citizen Suit Provision, 12 San Diego L.Rev. 107, 132 (1974), which discusses the beneficial impact that the statutory notice provision of section 304 has in allowing the EPA an opportunity to react to citizen complaints before a suit is filed, in some cases obviating the need for citizen suits
 
 
 [8]
 Though it is undisputed that Congress intended 28 U.S.C. § 1361 to extend mandamus jurisdiction, formerly exercised only by the District Court for the District of Columbia, to district courts elsewhere, and thereby authorize suits against officials who fail to perform ministerial acts, there is some doubt concerning whether the purview of the common law writ of mandamus was broadened by the inclusion of the words "in the nature of" before the word "mandamus" in section 1361, or whether Congress meant only to make the writ available as it was at common law. Compare Burnett v. Tolson, 474 F.2d 877, 880 (4th Cir. 1973), State Highway Commission of Missouri v. Volpe, 479 F.2d 1099, 1104-1105 n. 6 (8th Cir. 1973), and Peoples v. United States Dep't of Agriculture, 138 U.S.App.D.C. 291, 427 F.2d 561, 565 (1970) with K. Davis, Administrative Law Treatise § 23.09 (Supp. 1970), and Byse & Fiocca, Section 1361 on the Mandamus and Venue Act of 1962 and "Nonstatutory" Judicial Review of Federal Administrative Action, 81 Harv.L.Rev. 308, 318-320 (1967). For cases adopting the traditional and more prevalent view of section 1361 see Carter v. Seamans, 411 F.2d 767, 773 n. 11 (5th Cir. 1969), cert. denied, 397 U.S. 941, 90 S.Ct. 953, 25 L.Ed.2d 121 (1970)
 
 
 [9]
 The Supreme Court's view once was that a mandatory injunction could not be used to achieve the same results as mandamus, e. g., Smith v. Bourbon County, 127 U.S. 105, 8 S.Ct. 1043, 32 L.Ed. 73 (1888), but later decisions tend to suggest otherwise, Virginian Ry. v. System Federation, 300 U.S. 515, 551, 57 S.Ct. 592, 81 L.Ed. 789 (1937), cf. Panama Canal Co. v. Grace Line, Inc., 356 U.S. 309, 318, 78 S.Ct. 752, 2 L.Ed.2d 788 (1958), and a number of lower courts have used mandatory injunctions to perform the function of mandamus. See H. Hart and H. Wechsler, The Federal Courts and the Federal System 1384-1385 & n. 6 (2d ed. 1973)
 
 
 [10]
 The portion of this opinion dealing with the availability of remedies other than the right of action provided by section 304 to review the Administrator's failure to promulgate significant deterioration regulations has been circulated among all the judges of this court in regular active service, in view of the possible inconsistency between our holding and that of the Court of Appeals for the District of Columbia Circuit. No member of the court voted to rehear the case in banc
 
 
 [11]
 Determining that this failure was a sufficient ground for granting preliminary relief, the district court found it unnecessary to reach the question of whether defendants also violated NEPA, which was alleged by plaintiffs. La Raza Unida v. Volpe, 337 F.Supp. 221, 234 (N.D.Cal.1971). The Court of Appeals did not refer to NEPA
 
 
 [12]
 The district court defined location approval as the second stage of a highway project, in which the route is specifically established within a corridor which has previously been defined. (Id. at 223-224.) Location approval cannot take place unless the state highway department requests it and until a corridor public hearing is held on the project. (23 C.F.R. §§ 790.9(e) (1), 790.2(a) (1974).) Nothing comparable to these procedures has taken place in the present case