Robert MACHT, et al., Plaintiffs,

v.

Samuel K. SKINNER, et al, Defendants.

Civ. A. No. 89-1161.

United States District Court,
District of Columbia.

May 31, 1989.

Joseph J. McGovern, Beth Anne Smith, Philadelphia, Pa., for plaintiffs.

Mark E. Nagle, Asst. U.S. Atty., Washington, D.C., Mark D. McCurdy, Asst. Atty. Gen., Baltimore, Md., for defendants.

## MEMORANDUM AND ORDER

REVERCOMB, District Judge.

"Light rail transit" is a rail system utilizing modern versions of street cars which operate on their own rights-of-way or within reserved lanes of streets. Construction work on the City of Baltimore's light rail project is scheduled to begin July 1 and will consist of reinforcing bridges. Track work is supposed to begin September 1. The line will be 22.5 miles long, and is designed to unite the northern and southern metropolitan areas. The light rail system will cut through Robert E. Lee Park, using an existing railroad right of way. Defendants point out that the right of way through the park is currently used by freight train traffic, and has existed since 1839 (and thus predated the park). Formerly, (i.e., through the early 1970s), traffic on the line was much heavier than it is currently.

Plaintiffs have moved for a preliminary injunction to stop construction on the grounds that the project is subject to federal statutes governing parklands and the environment. Defendants admittedly have not complied with federal requirements under the Transportation Act and the National Environmental Policy Act of 1969. There is precedent for venue in this Court under *Taxpayers Watchdog Inc. v. Stanley*, 819 F.2d 294, 298 (D.C.Cir.1987), which was brought in Washington, despite the fact that it concerned the Los Angeles rail system.

The standard of review for issuance of preliminary injunctions was set forth in *Virginia Petroleum Jobbers Association v. FPC*, 259 F.2d 921 (D.C.Cir.1958). A party moving for a preliminary injunction must show (1) that there is a strong likelihood of success on the merits; (2) that the plaintiff will be irreparably injured in the absence of injunctive relief; (3) that the issuance of an injunction will not harm others; and (4) that the public interest will best be served by granting an injunction. Each prong of this test will be considered in turn.

(1) Likelihood of Success on the Merits.

Plaintiffs' complaint and motion for preliminary injunction seeks an injunction of the commencement of building on the grounds that defendants have not complied with NEPA or prepared a federal environmental impact statement. Defendants respond that there is no federal claim in this case because the construction soon to be

underway is of a "segment" of the project involving no federal funds. Plaintiffs reply that "segmentation" is illegal when it is used pretextually to avoid compliance with NEPA. They are arguing, in essence, that the State's proposed segmentation of the light rail line is a pretextual device designed to circumvent the requirements of federal law, and that the project is, in reality, a federal one. Because the Court finds that the project in all likelihood passes muster under the standards for segmentation established in this Circuit, this part of the *Virginia Petroleum Jobbers* test weighs against granting the injunction.

Defendants argue that the project is not a federal action, so that federal regulations do not apply. But, although they do not deny the possibility that federal funds could be used for extensions in the future, they also argue that the rail line is not an illegal segmentation of a federal project designed pretextually to avoid federal environmental regulations. The basis for defendants' claim that the rail system is not a federal project is that it will not use and has never been intended to use federal funds for construction of the segment. However, there was a request for federal funds for the rolling stock, (which was intended to equal $40 million, representing a 75% federal share of the cost of the vehicles), although that request was later withdrawn.

In the event the Court finds federal action, defendants argue there is no "use" of parkland triggering review under § 4(f) of the Transportation Act, and no "prudent or feasible alternative to the proposed use" (as that Act requires) of the presently existing right of way. They also argue that there is no "major federal action" significantly affecting the quality of the environment within the meaning of the National Environmental Policy Act, and thus no claim under that statute even if some minor federal involvement were found.

■ It is clear that under the Transportation Act, 49 U.S.C. § 303(c), the statute is meant to apply to transportation systems where federal funds are used to finance the construction of the project. If federal funds are not used, the act does not apply. *Adler v. Lewis,* 675 F.2d 1085 (9th Cir.1982). Similarly, NEPA applies only to federally aided projects: the requirement of an environmental impact statement applies to "major federal actions significantly affecting the quality of the human environment." NEPA "does not infringe on the right of a state to select a project to be financed solely out of its own funds." *Scottsdale Mall v. State of Indiana,* 549 F.2d 484, 488 (7th Cir.1977), *cert. denied,* 434 U.S. 1008, 98 S.Ct. 717, 54 L.Ed.2d 750 (1978).

■ In addition to their arguments based on improper segmentation, plaintiffs argue that there is federal funding because there was some federal involvement in the early planning stages of the system. However, there is case law saying that this form of federal participation can be so distantly related to actual construction that it should not be counted for purposes of determining whether a project is a federal one at heart. It has been held consistently that the prospect of future federal funding does not make a project "major federal action" for NEPA purposes during the planning stage. *Rapid Transit Advocates, Inc. v. Southern California Rapid Transit District,* 752 F.2d 373 (9th Cir.1985); *City of Highland Park v. Train,* 519 F.2d 681, 693–95 (7th Cir.1975) *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976); *Friends of the Earth, Inc. v. Coleman,* 518 F.2d 323 (9th Cir.1975); *City of Boston v. Volpe,* 464 F.2d 254 (1st Cir. 1972). Therefore, plaintiffs argument based on federal assistance during planning does not suffice to bring Maryland under the Transportation Act or NEPA.

But there *is* some evidence that defendants have deliberately tried to circumvent NEPA in the design of the system. The original proposal was to use federal money solely for the rolling stock, but when the Attorney General of Maryland and the federal Urban Mass Transit Administration ("UMTA") decided that that would constitute sufficient federal involvement to trigger coverage under NEPA, the state decid-

ed to "segment" the project and begin construction with the state-funded part of the system. The following is a revealing quote from Attorney General Curran:

> However, in December, 1988 MTA was formally advised [by UMTA] that such funding could not be provided without prior satisfaction of the requirements of the National Environmental Protection Act. *In order to allow the project to proceed on schedule, MTA now wishes to proceed in phases, with the federal contribution coming at the end of the project rather than at the beginning.*

Opinion of the Attorney General, Feb. 13, 1989.

There seems to be little doubt that the decision to proceed in segments was motivated, at least in part, by a desire to avoid compliance with NEPA. However, the segment which is to begin construction in July is a 22.5 mile project which will be funded entirely with state and local money and the state has withdrawn its application for federal funding for the cars because of concerns about delays in approval by the federal government if NEPA were to apply. Maryland defends the segmentation by arguing that it is a perfectly legitimate way for a state to avoid federal requirements by dividing an overall plan into component parts, but they admit that the rule against segmentation was developed to ensure that interrelated projects, the overall effect of which is environmentally significant, will not be broken up arbitrarily into smaller projects for no reason other than to avoid federal regulation. They also point to the D.C. Circuit's segmentation test, and argue that the segmentation in this instance meets that test.

██ Segmentation analysis is designed to weed out projects which are pretextually segmented, *and* for which there is no independent reason to exist. When the segmented project has *no* independent justification, no life of its own, or is simply illogical when viewed in isolation, the segmentation will be held invalid. The effect of the test is to replace a subjective analysis of motivation with a set of objective criteria. It seems to the Court that the states are entitled to invoke segmentation doctrine to insulate their construction projects from federal environmental law, so long as they meet the objective criteria of compliance. In this case, the State of Maryland entertained various suggestions for the light rail project, and concluded that the current proposal would enable it to proceed without the delays and expenses associated with compliance with federal environmental law. The Court believes that this is a legitimate choice for the State to make, and that requiring Maryland to comply with NEPA simply because it has tried to plan its project so as to *avoid* federal law would be an unfair surprise. It is an often-cited principle of jurisprudence that legal rules are expressed in case law and publicized, in part to inform actors of those situations where their conduct will bring them into violation of the law; once a legal principle is established, it is permissible for an actor to plan in accordance with the rule, and it is desirable for him to be able to *rely* on the rule in planning his conduct. Therefore, the Court will evaluate the light rail system in accordance with the test established in *Taxpayers Watchdog,* and use that case as the yardstick for determining the legitimacy of the proposed segment.

Under *Taxpayers Watchdog Inc. v. Stanley,* 819 F.2d 294, 298 (D.C.Cir.1987) the courts are supposed to consider the following criteria: (1) whether the proposed segment has logical termini; (2) whether it has substantial independent utility; (3) whether building the segment forecloses the opportunity to consider alternatives; and (4) whether federal funds are irretrievably committed to closely related projects. The Court will consider each factor in turn.

*1) Whether the proposed segment has logical termini.*

██ The segment here is 22.5 miles long (as opposed to a little over 4 miles in the Los Angeles project approved in *Taxpayers Watchdog*) and defendants argue that it has logical termini on both its northern and southern ends. Many segmentation cases

have turned on the issue of whether logical termini exist; the issue is easier to resolve (against segmentation) when the project is, for example, a highway *between* two cities, so that any segments shorter than the full length of the highway have no independent purpose. The fact that a highway leads to nowhere is a good sign that segmentation is utterly pretextual, but that is not the case here. Defendants point out that the termini for the proposed segment are logical in terms of local access and parking, that their location reflects the population and usage forecasts the State of Maryland has made, and that they end just before an extension at one end would have the adverse environmental effect of destroying an existing bicycle path. The locations of the proposed endpoint stations are areas of commercial significance: the State seems to be right in arguing that the segment has logical termini.

 Plaintiffs would have the Court evaluate the issue of logical termini by looking at the purported lack of autonomy in the other segments which may, possibly, be constructed in the future. However, the Court understands the test of *Taxpayers Watchdog* to imply that the logical terminus criterion is meant to be applied to the segment under consideration at the moment, not to segments which might be constructed at some unspecified date in the future, and which may or may not ever be built.

2) *Whether the segment has substantial independent utility.*

 Maryland has submitted a list of locations which will be easier to get to if the line is built. The proposed line has 30 stations located near downtown Baltimore employers, neighborhoods, schools, highway access points, and bus lines. An inspection of the papers and maps Maryland has submitted compels the conclusion that the line would have independent utility, and is *clearly* not a line from nowhere to nowhere, unlike the partial highway segments discussed by plaintiffs, which have been struck down as illegitimate segments.

3) *Whether building this segment forecloses the opportunity to consider alternatives.*

 This criterion is meant to prevent segments which "dictate" the construction of future linked segments which will involve federal funding. The purpose of this part of the test as well is to weed out completely pretextual segmentations. Defendants argue that the light rail project does not constitute one section of a larger federal project foreclosing alternatives, and they have submitted option papers discussing several existing alternatives for the future, including not going forward at all. For instance, future building might take the form of an extension of the current Baltimore subway line, which would be a "heavy rail" project. There is also the possibility of linking up the project with the Maryland spur of the Washington Metro. In any event, the construction of this line does not seem to dictate any particular future steps. Once the project is complete, it appears that it will be able to stand alone, and be viable without any specific extensions involving federal funding.

4) *Whether federal funds are irretrievably committed for closely related projects.*

 Any federal funds which may be sought are not irretrievably committed due to the discretionary nature of federal funding from the Urban Mass Transportation Administration. There is no current, irretrievable appropriation of money for any proposed extension to this system.

 For these reasons, the Court concludes that this project is likely to meet the objective criteria of the *Taxpayers Watchdog* test. As for the remaining prongs of the preliminary injunction test of *Virginia Petroleum Jobbers:*

(2) Irreparable Injury.

 Plaintiffs argue that the violation of NEPA is *per se* irreparable injury. The extent of the injury is disputed by defendants, who argue that the rail lines will occupy the same site as that of the old Pennsylvania Railroad line going to Harris-

burg, Pennsylvania. In addition, if defendants are correct on the merits, there will be no violation of federal statutes in this case, and the *per se* argument will not apply. However, there is case law finding that environmental damage constitutes irreparable injury, so that this part of the *Virginia Petroleum Jobbers* test inclines toward plaintiffs. Even so, there is merit to defendants' contention that there will not be irreparable harm to plaintiffs because the portion of the line under review is currently an operating freight line. There is no question, however, that the light rail line will increase traffic on the existing right of way enormously; plaintiffs' estimate is an increase of 21,000%. But defendants' point that the line will not be destroying virgin forests is a good one, since the installation of the line will not use park land beyond the right of way, and will not alter the characteristic use of the land involved. Furthermore, in balancing the equities in this case, it is appropriate for the Court to consider the attempts at mitigation which Maryland will undertake pursuant to the State EIS, including attempts to minimize noise and disruption of the park. *Cf. East 63rd Street Assoc. v. Coleman*, 414 F.Supp. 1318, 1330 (S.D.N.Y. 1976). Therefore, although the equities of this prong of the test incline toward plaintiffs, the issue of irreparable injury is not clear cut.

(3) Harm to Others.

 It is clear that enjoining construction of the light rail system would harm those citizens of Maryland who would use the system if it were built. The State of Maryland argues that it would be harmed as well because it has already entered into a number of contracts for the line; the cost of suspending these contract for as little as six months is estimated to be $14.5 million. Delays associated with an attempt to comply with NEPA would increase the cost of the project considerably. Defendants have clearly demonstrated that there would be harm to others if an injunction were to issue.

(4) The Public Interest.

 There is a substantial public interest in the construction of mass transit systems designed to ease the burden on overcrowded local roadways. The State of Maryland has submitted substantial documentation relating to projected population growth in the Baltimore metropolitan area over the next several years, and the consequent need for alternatives to automobiles for commuting, shopping, and access to the governmental, civic and artistic resources of the city.

There is a competing public interest in the enforcement of environmental protection laws, and in the interests those laws were designed to protect. But the analysis under *Taxpayers Watchdog* indicates that there is, at the least, a possibility that federal environmental laws do not apply to this project, while Maryland requirements have already been met. Thus, the plaintiffs have not shown that the public interest favors an injunction.

 For the reasons stated above, the Court concludes that plaintiffs have not met the burden of showing that they merit the extraordinary remedy of preliminary injunctive relief. Accordingly, the Motion for a Preliminary Injunction is DENIED.

The Court believes it is in the interest of all parties to put this case on a reasonably fast track to final resolution. Therefore, it is ORDERED

(1) that the parties shall submit dispositive motions to be filed with the Court within two weeks of the date of this Order, i.e., by June 14, 1989.

(2) Oppositions are to be filed by June 23, 1989.

(3) Replies are to be filed by June 30, 1989. Oral argument will not be scheduled.

SO ORDERED.