Kenneth HUPART et al., Plaintiffs,
Individually and on behalf of all
others similarly situated

v.

The BOARD OF HIGHER EDUCATION
OF the CITY OF NEW YORK et
al., Defendants.

Nos. 75 Civ. 178, 75 Civ. 915 and 75
Civ. 2117.

United States District Court,
S. D. New York.

Aug. 17, 1976.

Victor J. Herwitz, New York City, for plaintiff, Kenneth Hupart; Victor J. Herwitz, Michael J. Kopcsak, New York City, of counsel.

Giamboi, Reiss & Squitieri, New York City, for plaintiffs, Michael Scognamiglio and Robert Trotta; Joseph N. Giamboi, New York City, of counsel.

W. Bernard Richland, Corp. Counsel, New York City; Carmela Ackman, New York City, of counsel.

## OPINION

FRANKEL, District Judge.

Asserting claims under the Constitution, federal civil rights statutes, and New York's Education Law,[1] the plaintiff class[2] alleges that its members were unlawfully denied admission to the Biomedical Program of the Center for Biomedical Education of the City College of New York for the 1974 academic year. The complaint charges, inter alia, that the defendants intentionally discriminated against Caucasian and Asian applicants on racial grounds, and, more specifically, had a predetermined quota for Black and Hispanic applicants. Plaintiffs seek (a) to be admitted to the Biomedical Program, (b) monetary damages, and (c) a variety of other injunctive and declaratory relief. Named as defendants are the Board of Higher Education of the City of New York, the City College of the City University, the Center for Biomedical Education of the City College,[3] Robert E. Marshak, the President of City College, Alfred Gellhorn, the Director of the Center for Biomedical Education, Robert J. Kibbee, the Chancellor of the City University, and Alfred Giardino, Chairman of the Board of Higher Education.

Trial on the issue of liability commenced on May 10, 1976, and was completed on May 14, 1976.[4] The following are the court's findings of fact and conclusions of law.

### Findings of Fact

#### I. The Detailed Story Prior to 1974

The defendant Board of Higher Education is the corporate entity charged with governing and managing the public school system of New York City at the collegiate level. N.Y. Educ. Law § 6201 (McKinney 1972). The defendant City University is the name under which the Board administers the educational units within its jurisdiction. Id. at § 6202(1). The defendant City College is among those units. The Faculty Senate is the governing body of the College. The Center for Biomedical Education is an interschool program within the College.

---

1. The plaintiffs claim that the defendants violated the equal protection and due process clauses of the Fourteenth Amendment, 42 U.S.C. §§ 1983 and 2000d (1970), and §§ 313(1) and 3201(1) of New York's Education Law (McKinney 1969). Jurisdiction is invoked under 28 U.S.C. §§ 1343(3) and 1331; each member of the class is alleged to have suffered more than $10,000 damages as a result of defendants' actions.

2. The class, as certified on January 30, 1976, consisted of "Caucasian applicants to the Biomedical Program for the class entering in September, 1974, who * * * were denied admission to such Program solely because they were Caucasian, but for which fact they would

have been admitted * * *." The description in the consolidated amended complaint filed on February 5, 1976, includes all persons denied admission on account of race. The proof at trial supports the enlarged perimeters. Pursuant to Fed.R.Civ.P. 23(c)(1) and (d), the certification order is modified accordingly.

3. Plaintiffs now seem to concede, as defendants maintain, that the Biomedical Center is not a suable entity.

4. On January 30, 1976, the three captioned cases were consolidated and certified as class actions. By stipulation dated May 3, 1976, it was agreed that the issues of liability and relief would be tried separately.

The Center for Biomedical Education was created by resolutions of the Faculty Senate and the Board of Higher Education adopted on November 21, 1972, and November 27, 1972, respectively. The major objectives of the Program and its anonymous benefactors were to (1) educate and motivate young people to serve the under-served urban community as primary care physicians, (2) encourage and motivate minority students and women to enter medical careers, and (3) provide students with faster entry to and movement through medical school.[5] The idea for the Program was largely that of Dr. Robert E. Marshak, who was appointed President of City College in September 1970. He appointed Dr. Thomas Haines, a professor of biochemistry at the College, as the Biomedical Center's Acting Director. On January 1, 1974, Dr. Alfred Gellhorn, the former Dean of the Medical School of the University of Pennsylvania, was appointed permanent Director.

On December 5, 1972, the Faculty Senate met and created the Admissions Committee and the Policy and Planning Committee to oversee the development and operation of the Biomedical Program. The members of both committees are selected by various College personnel according to a formula adopted by the Senate. Pursuant to that formula, the members are drawn largely from the College faculty and the local medical community. The Chairman of an Ethnic Department and an officer of Ethnic Program Planning and Development serve on both committees.

At the same meeting, the Senate adopted the following resolutions:

"RESOLVED, That the Program is for academically qualified students, including a very substantial number of minority students and women."[6]

"RESOLVED, That entry into the Program will be dependent on students having met academic qualifications to be defined by the Admissions Committee. Students may be admitted on a probationary basis with certain course deficiencies if deemed to have the necessary broad qualifications."

There was also some discussion as to whether admission quotas should be established for "minority students," defined as Black, Hispanic, and Asian, in accordance with the definition used by the United States Department of Health, Education & Welfare. It is unclear whether these discussions ever culminated in a formal proposal put to a vote, but it is clear that the idea was never adopted by the Senate.

The 1973 Admissions Committee was chaired by Professor Robert P. Goode. At its meeting on January 8, 1973, the Committee "rejected after much discussion" the "principle that 50% of each category of admission to the program should be Black, Puerto Rican or Asian * * *." Proceeding under rather ill-defined standards, the Committee made its selections "on the basis of academic ability and social commitment." Interviews commenced in February, and did not end completely until July.

At the conclusion of a meeting on March 29, 1973, the Committee had selected 63 students, ranked in order of preference, for possible admission to the 1973 Biomedical Program.[7] Based upon 15 guaranteed places in various medical schools, the Admissions Committee recommended to the Policy and Planning Committee that no more than 35–40 invitations be extended.[8]

5. The Biomedical Program consists of (a) four years of liberal arts courses and intensified training in the natural sciences at City College leading to a B.S. degree, and (b) two years of clinical education at a medical school leading to an M.D. degree.

6. The parties have stipulated that defendants employ an active recruiting program among minority high school students to achieve this end.

7. March 15th was the original deadline for filing applications.

8. It was the Admission Committee's understanding of Policy and Planning Committee instructions that twice as many students should be enrolled in the Program as there were guaranteed places in medical schools. Since there were 15 such places as of March 29, the Admissions Committee recommended that 35–40 invitations be extended to ensure that the desired number of students (i. e., 30) would be enrolled in the Program.

Apparently responding to complaints that minority candidates were not being fully and fairly considered, the Policy and Planning Committee "asked for a report from the Admissions Committee prior to actual admissions * * * to examine for academic and ethnic breakdown." The Admissions Committee thought "this was inappropriate and objectionable * * *." It did not immediately comply with the request, but eventually supplied the desired data on the 63 students in a report dated April 30, 1973.

The "ethnic profile" provided to the Policy and Planning Committee showed that of the 30 top-ranked candidates, two were Black, seven Hispanic, seven Asian, and 14 Caucasian. Of 33 alternates, five were Black, four Hispanic, five Asian, and 19 Caucasian. When the ethnicity figures became public, several Black groups demanded that Blacks comprise at least half of the students admitted to the Program in 1973 and thereafter.[9] Dr. Haines, in a letter dated July 27, 1973, to Mr. Richard Parrish, Chairman of the American Federation of Teachers Black Caucus, reported that the final composition of the candidates admitted to the 1973 Program was 15 Blacks, 14 Latins, 9 Orientals, and 29 "others."[10] At the very least, then, eight additional Blacks and three additional Hispanics were invited to the Program after the Admissions Committee made its initial selection of 63 candidates.[11]

There was some ill feeling between Professor Goode and Dr. Haines. Professor Goode, in a letter to President Marshak dated May 30, 1973, with a copy to Dr. Haines, complained that the latter, in the May meeting with community leaders, had "attempted to place the onus for the low numbers of black students on the Admissions Committee and implied that there would be a significant increase of black students upon review of the latest number of previously incomplete applications." He went on to say that "[i]n the absence of a clear directive from the Acting Director or the Policy and Planning Committee, the Committee will continue to use the same criteria of academic proficiency and social commitment it has used in the past." Dr. Haines, in a letter to Professor Goode dated June 21, 1973, with a copy to President Marshak, praised the work of the Admissions Committee, but lamented that more Blacks had not been admitted to the Program, adding that he did not think this was the Committee's fault and hoped "that our recruiting and other efforts will improve black input in future years!"

### 1974 Admissions

Professor Philip Baumel, a member of the 1973 Admissions Committee, was unanimously elected Chairman of the 1974 Committee at its first meeting on December 7, 1973.[12] At that same meeting, the Committee discussed what had been done in 1973 and what the admission practices and procedures should be for 1974. The minutes of the meeting list the following items, among others, under the heading *"Procedures"*:

"c. A mechanical process of sorting out majority students with averages below 85.

9. Demands were made to President Marshak as well as various members of the Admissions Committee, including Dr. Haines and Professor Goode, at a meeting held with minority community leaders in May.

10. The explanation given to Mr. Parrish for the increased numbers of Blacks and Latins was as follows:

"The initial stages of the admissions procedure left us with 287 students whose applications were not in on time. When we discovered the low proportion of Black students in our initial group of students, we examined those 287 applicants to note their ethnic composition. Our discovery that seven ninths of that group were minority students provoked us to obtain those students' transcripts and interview the students. It is for this reason that the proportion of Black and Latin students in the program increased over its initial level."

11. At some point prior to May 16th, the Policy and Planning Committee decided to extend invitations to all 63 students.

12. Professor Baumel was a reluctant Chairman. He had been asked by Dr. Haines prior to the meeting to serve. When he accepted the position, he informed the Committee that he would "merely chair meetings and not serve in an executive capacity for the Committee."

"d. Keep minority students separate for a subcommittee to review and examine documents for admissability.

\* \* \* \* \* \*

"h. Minority students list divided up into two groups among subcommittee, yes or no, to be interviewed."

The following appeared under the heading *"Proposal"*:

"In interviewing minority students one member of the interviewing committee should be of that same minority group, whenever possible. A clear objective of the Committee."

Professor Baumel testified that the items listed under the first heading were merely questions "asked of and by members of the Committee" during the meeting. "[I]n most cases [there was not] any serious discussion leading to a conclusion." According to Baumel, none of the so-called "procedures" was ever adopted by the Committee, but the proposal to pair minority candidates with one interviewer of the same ethnic background was adopted and carried out.

The Policy and Planning Committee, at its November, December, and January meetings, discussed admission policies for the 1974 class. This Committee was chaired by Dr. Haines; several of its members also served on the Admissions Committee. It was the task of the Policy and Planning Committee to set admission "policies," leaving the establishment of "procedures" to the Admissions Committee. Among the policies adopted were: (1) no one over 26 years of age should be admitted, (2) students otherwise qualified, but deficient in mathematics, should be admitted, but such students should not exceed 20% of the class, and (3) no students, other than SEEK students,[13] who had taken more than four college credit courses, should be considered for admission.

Some time in January or February, an interview form was designed by Professor Baumel, Professor Theodore M. Brown, a professor of history at City College and Assistant Director of the Biomedical Center, Dr. Gellhorn, and possibly Dr. Haines. The form contained nine criteria on which each candidate was to be rated from 1 to 10, the average applicant being a "5," and no one a "0."[14] There was also a space for an overall comment. Of the nine criteria, eight related to non-academic characteristics. For example, Criterion No. 1 was "Motivation for urban medicine;" Criterion No. 7 was "Degree of commitment to extracurricular socially oriented activities;" Criterion No. 9 was "Suitability for our curriculum on Academic Considerations."

A file folder maintained on each applicant contained (1) a two-page form on which the applicant filled in certain background information and wrote an essay about tentative professional plans, (2) a high school transcript, (3) scores on the Regents Examinations and Scholastic Aptitude Tests, where available, (4) three letters of recommendation, and (5) the completed interview form. There was no space on the application form to designate racial or ethnic background, and no photograph was initially requested. However, if the Committee decided to interview an applicant, he or she was sent a letter scheduling the interview and requesting a small photograph.

Approximately 1287 applications were received for the 1974 academic year. They were first reviewed by the Associate Registrar of City College, William DiBrienza, to check whether the applicant met the technical requirements, such as age and previous education. About 50 applicants failed to meet these requirements and were eliminated from further consideration.

Responding to requests by several members of the Admissions Committee, Mr. DiBrienza attempted to categorize the applicants according to their respective racial backgrounds by looking at name, high school attended, address, and extracurricular activities. He, or someone on his staff,

---

13. The SEEK Program seems to have been a special program at City College for minority students.

14. The ratings on the nine criteria were never added together or averaged to produce a composite score.

prepared three memoranda, dated January 2, 8, and 10, showing the number of completed applications by White, Black, Spanish, and Asian students. The figures contained in the January 8th memorandum were announced by Dr. Haines at a meeting of the Policy and Planning Committee on January 10, 1974. Mr. DiBrienza, who attended most, if not all, of the meetings of the Admissions Committee, reported these running racial counts to that committee as well.

The remaining 1250 applications were screened by two three-member subcommittees of the Admissions Committee to eliminate "clearly unqualified" applicants. Applicants were rejected at this stage chiefly because of (a) a low high school average [15] or (b) demonstrated lack of serious interest in the Program.[16] 599 candidates survived this stage and were scheduled for interviews.[17]

The interviews of these remaining candidates began in mid-February and continued through the last week of March. They were conducted by approximately eleven two-member teams.[18] At the conclusion of each interview, the interviewers, usually jointly, ranked the applicant on the nine admission criteria and made a recommendation of some sort.[19] The file folders were returned to Associate Registrar DiBrienza, who eliminated those students who had been "clearly rejected" by the interview

teams, as determined by the interviewers' comments and rankings.

The Admissions Committee met on several occasions to discuss the applicants who had not been rejected by the interviewers. At the early meetings, a member of each interviewing team "presented" the team's applicants for full Committee consideration. After discussion, applicants were either eliminated from further consideration or placed in a tentative accept category. Applicants who had not been eliminated were rediscussed and reconsidered at successive meetings. By the time the Committee met on March 20th, the remaining candidates were being sorted into one of four categories, "Yes," "No," "Hold," or "Math Hold." [20] When the Committee held its final meeting on March 28th, approximately 260 applicants remained. The plaintiffs' statistical expert submitted an affidavit stating that the "interview survival rates" were not significantly different across racial groups.

The full Admissions Committee met for the last time on March 28, 1974. The meeting was held at the Columbia Faculty Club; it began about 6:00 p. m. and was adjourned shortly after 10:00 p. m. The Committee's task was to determine finally which candidates were to be offered admission into the Program, so that their names could be submitted to the City University's Application Processing Center for the next

---

15. Applicants with averages below 85 were eliminated unless their applications evidenced particularly strong commitments to urban medicine.

16. A one- or two-line essay was generally regarded as a sufficient demonstration of indifference to warrant elimination.

17. The plaintiffs make no claim "that any persons, Caucasian or otherwise, eliminated at or before the interview stage were injured thereby * * *."

18. Because of the large number of applicants to be interviewed, eight faculty members who were not technically members of the 15-person Admissions Committee served as interviewers and participated in Committee meetings. Both Dr. Gellhorn and Professor Brown were such "extra" members.

19. Not all interviewers rated the candidates on the criteria.

20. Professor Baumel, Professor Brown, Dr. Gellhorn, and Mr. DiBrienza, all of whom testified at trial, were in basic agreement as to the meaning of three of the four categories. "Yes" meant that the candidate would be admitted, at least of there was space for him in the class; "Hold" meant that the candidate could not be eliminated at that point; "No" meant that the candidate would not be admitted. The most elusive category was "Math Hold;" it seems to have been responsive to the Policy and Planning Committee's "suggestion" that math deficient students be admitted, and it generally meant that the candidates so labeled would be reconsidered before final selections were made.

day. The format of this final meeting was essentially the same as that followed at the March 20th meeting. That is, one of the two interviewers "presented" each of the remaining interviewees to the full Committee; after discussion, some consensus was reached, though apparently never by a formal vote, to put each applicant into one of the four categories.

Before the meeting began, each member of the Committee was given a worksheet, prepared by Dr. Gellhorn's Administrative Assistant, which listed each of the remaining candidates.[21] The worksheet was divided into several columns, including one headed "Race." There were also columns for various academic data and one headed "[Interviewers'] Most Important Comment, If Any." Most of the information called for had been typed in prior to the meeting by secretarial personnel of the Biomedical Center. The worksheets used by Professor Baumel,[22] Dr. Gellhorn, and Mr. DiBrienza were introduced into evidence at trial. The racial identification for some candidates was blank; in other cases, it was handwritten in at the meeting as the information became known during discussions. As each candidate was "categorized," Professor Baumel, Dr. Gellhorn, and Mr. DiBrienza kept track of the Committee's decision under the "Most Important Comment, If Any" heading.

By some time before 10:00 p. m., the Committee had discussed each of the 260 applicants. At that point, 94 students were in the "Yes" category[23] and between 84–100 others in one of the two "Hold" categories. Dr. Gellhorn announced that the Center could not accept more than about 65 students, and that no more than 70 invitations should be extended.[24] At about the same time, the Committee was informed that the Faculty Club was closing. Thereupon, Dr. Gellhorn suggested that a subcommittee should be appointed to reduce the number of "accepts" to somewhere around 70.

Dr. Gellhorn appointed a subcommittee consisting of Professor Baumel, Professor Brown, Ms. Sanchez, the College's representative to the local Hispanic community, and Ms. Henderson, the College's representative to the Black community, to complete the selection process. At that point, Mr. DiBrienza handed Professor Baumel a list showing the ethnic identities of the 94 "Yesses." Professor Baumel announced the breakdown to the Committee. According to his trial testimony, he then faced the committee with "What do we do now?" He testified that "the result was almost a bombardment of suggestions, an enormous variety of ideas, some sensible, some not so sensible * * *. It was mostly a lot of voices coming from various places, and I

21. These worksheets were also distributed and used at the March 20th meeting.

22. The worksheet introduced as Professor Baumel's was not the one he actually used at the meeting, but the notations thereon were transcribed from the sheet he did use.

23. The figure of 94 has been determined by comparing the Baumel and DiBrienza worksheets. A candidate was considered "Yes" if he appeared as such on both worksheets. Professor Baumel's worksheet listed an additional two Latins as "Yesses." Both candidates appeared as "Holds" on Mr. DiBrienza's and Dr. Gellhorn's worksheets. The notations for these two on Professor Baumel's worksheet appeared as follows:

"~~Hold~~   Yes

~~Hold~~   Yes"

The "Yesses" would seem to have been added at a later time. In light of that, Professor Baumel's concession at his deposition that "94"

was probably the correct figure, and the agreement between the Gellhorn and DiBrienza worksheets, the court finds that the two Latins were never full Committee "Yesses." The court also finds that there were 94 full Committee "Yesses" at the end of the meeting and that 75 of them were offered invitations on March 29th.

24. It is not clear how the number 70 was derived. At the meeting of the Policy and Planning Committee on December 4, 1973, Dr. Haines announced that they then had 40 guaranteed medical school places. He also pointed out that the Bulletin that had been distributed to prospective students estimated that the class size would be between 100 and 105, but said that the Policy and Planning Committee would make the final decision as to class size. There is no indication in the record that a formal decision was ever made or why the optimum size was thought to be 65.

think a sense of surrender on the committee not being able to find a sensible way to proceed."

Professor Baumel further testified that someone "perhaps me—said 'Well, one thing we can do is pick the biggest number and reduce them, and that is the white males * * *.'" No one objected to this suggestion. Although the Committee never formally voted on it, the "understanding" shared by all was that the subcommittee was authorized to make its final selections from those candidates who were either in the "Yes" category or one of the two "Hold" categories.[25] No further instructions were given in express terms that the witnesses could recall. The incomplete memories suggested an inaccurate picture— of a subcommittee left with no instructions whatever for performing the full committee's mandate.

The subcommittee retired to an apartment with the file folders of the candidates who had been placed in the "Yes" and two "Hold" categories.[26] Most, but not all, of the folders were read again; several of the "Holds" were specifically singled out by Professor Brown for the subcommittee's attention based on his recollection that either he or some other committee member had queried their placement in "Hold" rather than "Yes." Professors Brown and Baumel did the lion's share of the work in the subcommittee, with participation by Ms. Sanchez for part of the evening[27] and the presence and very occasional participation of Ms. Henderson.[28]

Both Professors Baumel and Brown deny that race was a consideration in the subcommittee's deliberations and claim that no one kept a running count of the ethnic breakdown as they proceeded.[29] Professor Baumel testified that candidates were rejected primarily for lack of "commitment to urban medicine." Full Committee "Yesses" were accorded some weight in the deliberations, but were not regarded as binding. It is clear that the task of elimination was not an easy one. Professor Baumel characterized the problem this way:

> " * * * I think at that time I assumed that virtually all the students whose records we took off to consider in the subcommittee meeting deserved to be admitted; that we had to pick at straws, we had to look for perhaps inconsequential reasons to eliminate, rather than search for reasons to admit * * *. We, as I remember, went through folder after folder looking, as I said, for reasons to say 'No.'"

By 3:00 a. m., the subcommittee had pared the list of accepts to 79. Understandably weary from their labors, they decided not to attempt to reduce the number further. Of the 79, 75 had been full Committee "Yesses," while four had been placed in

25. The reason for this rather broad mandate, as explained by Professors Baumel and Brown, Dr. Gellhorn, and Mr. DiBrienza, was that there had been a growing sense throughout the evening that the placement of candidates in the various affirmative categories had become increasingly arbitrary.

26. Although Professors Brown and Baumel testified at trial that there were about 200 such students, Professor Brown in his deposition thought there were about 150.

27. Ms. Sanchez left early because of a speaking engagement scheduled for the next day.

28. At his deposition, Professor Brown testified that Ms. Henderson was apparently not feeling well.

29. Their denials, however, are a bit equivocal. For example, Professor Baumel, in his deposition, admits that race or ethnic background may have been discussed by the subcommittee "in a case or two." He also said, thinking back over the whole process, that he personally thought Caucasians and Blacks were different" and that "[t]hey were treated differently." Similarly, Professor Brown did not say at his deposition that the subcommittee clearly did not single out Caucasian males for elimination, but rather that he could not recall their doing so. When asked to compare the file folder of an eliminated male Caucasian "Yes." with the folder of an invited black female, Professor Baumel conceded that if the two students had been directly compared, he would "quite obviously" have chosen the male Caucasian. He candidly admitted that he did not know if race had dictated the subcommittee's decisions on these two candidates.

one of the two "Hold" categories. Of the 19 full Committee "Yesses" eliminated by the subcommittee, 12 were male Caucasians, two were female Caucasians, and five were Asians. No Blacks or Latins were eliminated. Of the four candidates moved from the "Hold" categories, two were Caucasian, one was Latin, and one was Black. The remaining file folders were left in a separate stack and constituted the subcommittee's "alternate" list.

As became known at a later time, the actual ethnic breakdown of the 79 candidates selected for admission was 23 Blacks, 15 Latins, 33 Caucasians, and 8 Asians, or a total of 38 Blacks and Latins as compared to 41 Asians and Caucasians. From the DiBrienza and Baumel worksheets, however, it appeared that 39 of the 79 were Black and Latin and 39 Caucasian and Asian, with one candidate of unknown ethnic background. The plaintiffs' statistical expert testified that the elimination proportions differed significantly according to race and that the eliminated candidates had significantly higher high school averages than the 79 invitees.

As of April 18, 60 of 79 invited applicants had accepted. In a letter of that date, Dr. Gellhorn requested the subcommittee to reconvene to rank-order the alternate list so that eight additional students could be offered admission. Noting that the information contained therein was not yet "public," Dr. Gellhorn attached a table containing the following background information on the candidates who had accepted:

|  | Female | Male | Total |
|---|---|---|---|
| BLACK | 10 | 6 | 16 |
| LATIN | 3 | 9 | 12 |
| ASIAN | 3 | 1 | 4 |
| CAUCASIAN | 11 | 17 | 28 |
| Total | 27 | 33 | 60 |

Copies of Dr. Gellhorn's letter were sent to President Marshak and Robert Carroll, the Vice-President of City College in charge of Community Relations.

Another table was prepared in the Biomedical Center showing the number of invitees in each racial category who had accepted, rejected, or were still considering their invitations as of April 18, 1974. The subcommittee had this table when it proceeded to meet on April 23. It contained the following information:

|  | Yes | No | Undecided |
|---|---|---|---|
| Blacks | 16 | 7 | 0 |
| Latins | 12 | 1 | 2 |
| Asians | 4 | 3 | 1 |
| Caucasians | 28 | 5 | 0 |
| Total | 60 | 16 | 3 |

Professor Baumel claims that Dr. Gellhorn's letter was preceded by a telephone call requesting him to reconvene the subcommittee and choose eight alternates, two from each of the four ethnic categories. Dr. Gellhorn recalls talking to Professor Baumel, but has no recollection of asking him to choose the alternates by ethnic category. Professor Brown testified that he did not remember any instruction to that effect being conveyed at the second meeting of the subcommittee.

At the outset of the April 23 meeting, Ms. Henderson demanded that all of the seven Blacks who had declined be replaced with Black alternates. The other subcommittee members disagreed, whereupon Ms. Henderson left the meeting. After some discussion, Professor Brown telephoned Vice-President Carroll, Ms. Henderson's immediate supervisor, who suggested that the alternates be chosen in proportion to the number of declinations within each of the four racial groupings. Ms. Henderson, who was in Vice-President Carroll's office dur-

ing the conversation, returned to the meeting.

Applying the formula, it was calculated that four Blacks, two Latins, two Caucasians, and one Asian should be chosen as alternates. Ms. Sanchez then pointed out that if the numbers had been rounded differently, the result would have been three Latins and only one Caucasian. She suggested that the ultimate ratio should be 4:3:1:1 instead of 4:2:2:1. The other members of the subcommittee agreed to her suggestion, whereupon each member took the file folders of a given ethnic group and rank-ordered them. The candidates of different racial categories were never compared with one another.

After the ranking was completed, the subcommittee prepared a list of 35 top-ranked alternates and listed the names of the nine candidates who should be offered immediate admission. The list was subdivided into the four racial groupings. There were seven Asians, 11 Blacks, eight Caucasians, and nine Latins rank-ordered within their respective groups. The nine candidates proposed by the subcommittee were offered admission, as was an additional Asian candidate,[30] bringing the totals of accepted and new invitees to 35 Blacks and Latins as compared with 35 Caucasians and Asians.

A day or two later, Professor Baumel received a telephone call from a teacher at one of the local high schools asking why a certain candidate, whom the teacher thought highly qualified, had not been ad-mitted. Professor Baumel did not recall the candidate by name, and replied that he did not know why the student had not been admitted, but would try to find out what he could. Professor Baumel then retrieved the student's file and discovered that he was the second-ranked Caucasian, who had been replaced by a Latin pursuant to Ms. Sanchez's suggestion. Looking through the file, Professor Baumel was struck by the strength of the student's qualifications and could not imagine why he had not been admitted. He was overcome by a feeling of shame for having traded one human being for another on the basis of race.

Professor Baumel then called Dr. Gellhorn, explained the situation, and asked that this particular student be admitted. Dr. Gellhorn agreed to admit the student, but only if the next-ranked candidate in each of the other ethnic categories was admitted as well. He asked Professor Baumel to take his suggestion to the other members of the subcommittee. Professor Baumel did that and obtained the other members' approval. Four additional students were then invited. The 50/50 division between "minority"[31] and "majority" candidates who had accepted and been newly invited was thus maintained.

The final ethnic breakdown of all invited applicants was 28 Blacks, 19 Latins, 35 Caucasians, and 11 Asians, or a 47/46 split between so-called "minority" and "majority" students. The final composition of the class of 1974 was 18 Blacks, 14 Latins, 27 Caucasians, and four Asians, or a 32/31 minority/majority split.

---

**30.** It is not clear who chose the tenth candidate. It is clear, however, that he was the second-ranked Asian.

**31.** Defendants maintain that plaintiffs' definition of "minority" is one of convenience rather than reality. It is true, as defendants say, that HEW's definition, as explained to and understood by the Faculty Senate, included Asians as well as Latins and Blacks. Chancellor Kibbee's June 18th report to the Board of Higher Education also used the broader definition. But the court finds that the Admissions Committee considered Hispanics and Blacks to be a distinct minority subset and did not regard or treat Asians in the same manner. The external pressures from the minority community were largely, if not totally, from Blacks and Hispanics. In Dr. Haines's 1973 letter to Mr. Parrish of the Black Teachers' Caucus, "minority" was defined both ways, showing a particular concern about Blacks and Hispanics. It is also significant that the College had special representatives to the Black and Hispanic, but not Asian, communities, and that both of these representatives served on the subcommittee. It emerges that Blacks and Hispanics were regarded as a distinct "minority grouping" in the minds of those connected with the Biomedical Program.

Shortly after the alternates were selected, Professor Baumel spoke with his friend Harry Lustig, a dean at City College, about the admissions process. From this conversation, Dean Lustig inferred that the administrators of the Biomedical Program had decided to employ a quota for Latins and Blacks, as had been demanded by the minority community. An article in the *New York Times*, dated May 9, 1974, reported Dean Lustig's claim that a 50% quota had been used.

After reading the *Times* article, Dr. Gellhorn sent a memorandum, dated May 9, 1974, to President Marshak in which he described the admissions process. As Dr. Gellhorn admitted at trial, this memorandum did not describe what had taken place with complete accuracy, but it did state that the alternates were ranked in and chosen proportionately from four ethnic categories.[32] On May 15th, Dr. Gellhorn sent his annual report to President Marshak; it, too, described the admissions process and provided various demographic data on the 1974 class, including the number of students invited from each racial category. President Marshak sent the report to Chancellor Kibbee.

On or about May 12, 1974, President Marshak telephoned Professor Baumel and asked him to respond to the charges that race had been a factor in the selection of the 1974 Biomedical Program class. At the conclusion of the conversation, Marshak asked Baumel to put what he had said in writing. Professor Baumel immediately drafted a memorandum reporting what he had said on the telephone. The next day, he typed his handwritten memorandum, only making grammatical changes, and delivered it to President Marshak's office.

Professor Baumel's memorandum addressed the entire admissions process for 1974. Describing the closing minutes of the final meeting of the full Admissions Committee at the Columbia Faculty Club, he wrote:

"At that point, a count by ethnic category and sex was made, and the Committee decided that the reduction should be done in the 'Caucasian-male' category. Dr. Gellhorn suggested that a subcommittee of Baumel, Brown, Henderson and Sanchez do that selection, and that this subcommittee prepare an alternate list from those selected out and from those names in the 'hold' list.

"The subcommittee * * * after several hours, selected out a group of male-Caucasians, principally by selecting out those students with the weakest history of participation in community and health-related activities."

On May 31, 1974, Chancellor Kibbee wrote to President Marshak asking him to provide further information on the admissions process so that the Chancellor could report to the Board of Higher Education. After talking to Professors Brown and Baumel, President Marshak instructed the two men to meet together on the morning of June 3d at the Biomedical offices, reexamine the file folders of the candidates considered by the subcommittee, review the worksheets kept during the meeting, and try to reconstruct what had happened. They were specifically instructed to determine whether Professor Baumel's assertion about eliminating Caucasian males was borne out by the data. Professor Baumel testified that as he reviewed the file folders and worksheets with Professor Brown, he came to realize that his statements about Caucasian males were not true.

---

32. When the memorandum was first introduced at trial, Dr. Gellhorn did not recognize it as his own. After checking his records, he conceded that he had written it, but could not explain the inaccuracies. The memorandum erroneously stated that the subcommittee had only selected a list of 86 alternates on the night of March 28th, divided into ethnic categories, and that the last four alternates were invited because of "additional changes of acceptances among those who had originally accepted." While these errors are somewhat disturbing, the court has not attached any overriding sinister significance to them. By and large, they seem to have resulted from an oversimplification of the actual events, and perhaps an attempt to depersonalize what had been done and decided by selected individuals, whom Dr. Gellhorn did not want to single out by name.

President Marshak joined Baumel and Brown at about noon and asked what they had discovered. They were now convinced, they said, that the subcommittee had not eliminated only Caucasian males, as evidenced by the fact that female Caucasians and Asians who had been "Yesses" by the full Committee were eliminated as well. After "sharply questioning" both men and reviewing several file folders himself, President Marshak concluded more broadly that the subcommittee had not compiled its list of 79 initial invitees on the basis of race. In a letter to Chancellor Kibbee dated June 6th, most of which had been drafted by Professor Baumel, President Marshak did not mention Professor Baumel's original accusation that the Admissions Committee had instructed the subcommittee to make reductions in the male Caucasian category or that he had investigated the charge and concluded that it was false. He did report that the alternates had been selected along racial lines, although in somewhat less explicit terms than had been drafted by Professor Baumel.[33]

Chancellor Kibbee issued a report on June 18, 1974, wherein he concluded that there had been no racial discrimination in the original selection of 79 students. He went on to note, however, "that all of those involved felt that the Program would produce a 'substantial number' of minority students" and that "it is difficult if not impossible to ascertain what effect, if any, this general mindset had on decisions about individual students." The Chancellor also reported that the "process had broken down" at the alternate stage where candidates were chosen from racially-ranked lists. He made several suggestions for improving the admission criteria and for ensuring that racial and ethnic factors would be kept out of future selections.

Chancellor Kibbee, President Marshak, and Dr. Gellhorn all testified that they regarded the selection of alternates as improper. Chancellor Kibbee and President Marshak went further and stated that using race as a basis for the selection of alternates violated the "unwritten" policy of the Board of Higher Education and was probably "illegal" as well. Dr. Gellhorn thought that selections by race at least departed from the full Committee's policy; he was aware, too, that President Marshak regarded such a procedure as a violation of College and University policy.

Various ethnic groups complained throughout the summer about the discriminatory selections. President Marshak, and to a lesser extent, Chancellor Kibbee and Dr. Gellhorn, considered how the effects of the discrimination might be rectified. With that in mind, President Marshak met with Professor Brown in October to try to determine which students had been injured by the procedures. He had Professor Brown review the folders of the 15 full Committee "Yesses" who had been eliminated by the subcommittee and not subsequently admitted as alternates. Professor Brown did so and prepared a handwritten memorandum outlining the possible justifications for the subcommittee's elimination of these candidates. As instructed by President Marshak, Professor Brown brought his memorandum and a large number of file folders, including those of the 15 eliminated "Yesses," to the meeting. They reviewed them together.

Concluding that it was nearly impossible to tell who had been injured by the discriminatory selections and that it was too late to do anything for 1974 anyway because classes had started and because of insufficient laboratory space and guaranteed places in medical schools, President Marshak and Dr. Gellhorn, with the approval of

33. Some changes from the Baumel draft to Marshak's June 6 letter are of interest. Professor Baumel's draft said that Dr. Gellhorn had suggested that the subcommittee "might propose 2 from each ethnic category" as alternates. He also stated that "the black person on the subcommittee demanded that all seven

black students who had declined be replaced by black applicants [and that] [t]his outrageous demand led to a serious fight." President Marshak's letter merely reported that the alternates had been selected "by proportioning the [racial] categories according to the declinations [by each racial category]."

Chancellor Kibbee, decided to reevaluate all of the alternates and invite the top 14 to participate in the 1975 Program. The alternates were judged and ranked under revised admission standards adopted for the 1975 class. Of the top 14 students, four had been admitted as alternates in 1974. The remaining ten were sent invitations; six accepted. Only three of the ten had been full Committee "Yesses." On June 30, 1976, the defendants, without admitting that any discrimination had occurred during the first subcommittee meeting, extended invitations to the Program to the 12 full Committee "Yesses" who had been eliminated and not offered admission at any later time.

## II. *Ultimate Findings on Key Issues*

The Biomedical Program is by its nature race-aware. One of its major objectives is to encourage minority students to enter medical careers on the seemingly sound judgment that they will be more likely to serve, and may better serve, the urban community as primary care physicians. While the Faculty Senate, President Marshak, and the Admissions Committee for 1973 and 1974 formally rejected a specific numerical quota for minority students, other efforts were made to ensure that "a substantial number" would be in the Program. The most explicit effort was an intensive recruiting program among minority high school students to ensure a large pool of well-qualified minority applicants. The non-academic admission criteria and the "Math Hold" concept are less obvious examples.

Pressures beginning in early 1973 from the Black and Hispanic communities for at least a 50% quota heightened the racial awareness of the City College personnel associated with the Biomedical Program. As Professor Brown put it, "in those days one could not have lived at City College and been unaware of ethnic pressures." In response to these pressures as well as the Program's objective to enroll qualified minority students, the 1974 Admissions Committee instructed Mr. DiBrienza to ascertain the ethnic identifications of the applicants. He reported his tabulations to the Admissions and Policy and Planning Committees throughout the selection process. The interviewers frequently recorded the ethnic background of candidates on the interview forms. That Dr. Gellhorn's Administrative Assistant, on her own initiative, designed a worksheet with "Race" as one of the data columns shows the pervasiveness of what Chancellor Kibbee referred to as the racial "mindset" in 1974.

The Admissions Committee was not of a single mind as to how or whether race should be used as an admissions criterion. To borrow again from Professor Brown, "ethnic battle lines were drawn." While Ms. Henderson and others clearly favored a specific quota, the predominant view seems to have been that race should not be the sole criterion, but that it was a relevant consideration. Being Black or Hispanic was regarded by most interviewers as a positive factor.

The Committee's ethnic policy was not formalized as such until the subcommittee was assigned its task at the end of the "emotionally charged" meeting at the Columbia Faculty Club. After all 260 candidates had been categorized, Dr. Gellhorn informed the Committee that all 94 "Yesses" could not be invited. He appointed the subcommittee of four to reduce the number to 70. Ms. Sanchez and Ms. Henderson were appointed to the subcommittee because of their relationship to the Hispanic and Black communities, respectively. Before the meeting finally adjourned, Professor Baumel announced the racial identities of the 94 "Yesses" and asked the Committee for directions as to how the list should be reduced. The only answer he got, made explicit by his own uncontradicted statement of the subcommittee's charter, was that reductions should be made largely or wholly in the male Caucasian category. This was the subcommittee's mandate. To be sure, it was not a formally adopted resolution, but it was taken and applied by the subcommittee as the guiding selection principle.

While not all of the reductions by the subcommittee occurred in the male Caucasian category, none were made in the Black or Hispanic categories. The ethnic backgrounds of all 19 eliminated "Yesses" were apparent from Professor Baumel's worksheet, which he had with him at the subcommittee meeting, and from the file folders as well. From the court's own comparison of the application folders of the 19 eliminated candidates with the folders of minority "Yesses," no obvious distinctions emerge on the various social commitment criteria or interviewers' comments on commitment to urban medicine. In a case or two, there was a notation on the interview sheet of an eliminated candidate that may have been read as a sign of weakness on the relevant factor.[34] But there were also isolated examples showing strength.[35] The same pattern prevailed for the minority "Yesses." [36] The pervasive and overriding criterion was race; the general understanding was that there would be an overall reduction of white males and an increase in Blacks and Hispanics to be accepted.

It is undisputed that racial factors were intentionally employed in the selection of the 14 alternates. Dr. Gellhorn directed Dr. Baumel and the subcommittee to choose two candidates from each of the four racial categories. A second College official, Vice-President Carroll, then devised the racially-based formula that was used to pick nine alternates. The court cannot determine who selected the tenth alternate in this first group, but it is clear that someone at the Biomedical Center did in order to maintain the 50/50 division between majority and minority invitees. The last four alternates were also chosen on a racial basis pursuant to Dr. Gellhorn's instructions. In the selection of alternates, then, members of the plaintiff class were discriminated against solely because of race.[37]

While it is not necessary to find that the subcommittee employed some specific quota to find that the class members were discriminated against solely on the basis of their race, see *DeFunis v. Odegaard, supra,* 416 U.S. at 333, 94 S.Ct. 1704 (Douglas, J., dissenting), the court is compelled to such a finding. Although it does not appear that the full Committee or the subcommittee was actually operating under a 50% or any other specific quota, it does appear that a

34. The interviewers' comments on one of the eliminated Caucasian males was: "Recommend for admission [, but] he is weak in item # 1 [Motivation for Urban Medicine] but is open to motivation that we can offer him. Would easily be able to get it together." Professor Baumel, as an interviewer, commented on another of the eliminated Caucasian males: "Very good academic record. I think this is a sincerely *good* person and although the evidence for urban commitment is weak I think he is educable. Yes."

35. The interviewers' summary on one of the eliminated Caucasian females was: "Recommend very highly—Well rounded both academically and urban motivated * * *. Feel strongly that she is an ideal candidate-just what we are looking for." This same interviewer had also noted that this candidate was "White." The interviewers summarized one of the eliminated male Caucasians this way: "Impressed us with his very strong determination and interest in pursuing urban medicine * *. Strongly recommend."

36. For example, Professor Baumel described one Latin male as "too establishment to be described as having 'urban commitment' but is aware and interested." Professor Brown, after

interviewing one Black male "Yes," wrote: *"Social awareness not too high."* He gave the candidate a ranking of "5–6" on Criterion No. 1, "Motivation for Urban Medicine." Another of the "Yesses" was described this way by Dr. Gellhorn after an interview: "This 18 year old black female shows maturity, confidence, commitment to urban medicine * * *. Enthusiastically recommend."

37. The admitted discrimination that occurred in the selection of alternates presents difficult questions to be resolved at the relief stage of the trial. That is, since there were "quotas" for each ethnic category, all those not selected were *prima facie* injured by the discrimination in that they each had fewer places to compete for. See *DeFunis v. Odegaard,* 416 U.S. 312, 333, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974) (Douglas, J., dissenting). The burden would seem now to be on the defendants to show that given individuals who were denied admission and are in plaintiff class were not injured by the procedures. But this question is not finally resolved at this time. It is left for further consideration at the remaining, second stage of the case.

50/50 split between Blacks and Hispanics versus "others" was an approximate goal permeating the process, especially at the subcommittee stage. And the course taken by the subcommittee was no independent detour; it followed instructions both explicit and implicit taken from the Columbia Faculty Club meeting as well as a longer course of selection history.

In sum, the court concludes that plaintiffs have proved that:

(1) 19 Asians and Caucasians were intentionally eliminated on the basis of race during the selection of the original 79 invitees;

(2) discrimination solely on the basis of race was practiced in the selection of the 14 alternates; and

(3) a 50% quota for Blacks and Hispanics was a desired goal of the subcommittee in making its selections.

### Conclusions of Law

I. *Procedural and Jurisdictional Questions*

A. *Jurisdiction over the Institutional Defendants:*

There are substantial, and likely insuperable, barriers to plaintiffs' plea for monetary relief against the institutional defendants. Because not all of the relevant issues have been briefed by the parties and because the court hereinafter concludes that it cannot now be determined whether subject-matter jurisdiction exists over institutional defendants, they will not now be dismissed, but the issues will be readdressed, if necessary, at the conclusion of the second phase of this action.

■ Plaintiffs' invocation of 42 U.S.C. § 1983 and 28 U.S.C. § 1343(3) as a basis for this court's jurisdiction fails as to the institutional defendants. Although the law in other circuits is less clear, see *Gray v. Union County Intermediate Education District,* 520 F.2d 803, 805 n. 1 (9th Cir. 1975), the Second Circuit precedents amply support the conclusion that these public defendants are not "persons" within the meaning of § 1983 and thus not within this court's jurisdiction under 28 U.S.C. § 1343(3). See, e. g., *Monell v. Department of Social Services,* 532 F.2d 259 (2d Cir. 1976); *Blanton v. State University of New York,* 489 F.2d 377, 382 (2d Cir. 1973). This ruling, however, does not end the jurisdictional inquiry.

■ Plaintiffs have also asserted jurisdiction under 28 U.S.C. § 1331, based upon a cause of action directly premised on the Fourteenth Amendment. While our Circuit has yet to reach this "difficult and troublesome constitutional question," *Fine v. City of New York,* 529 F.2d 70, 76 (2d Cir. 1975); *Brault v. Town of Milton,* 527 F.2d 730, 738 (2d Cir. 1975) (en banc), at least four circuits have decided that jurisdiction does lie under § 1331, provided that the requisite jurisdictional amount is alleged and proved. See, e. g., *Gray v. Union County Intermediate Education District, supra,* 520 F.2d at 805; *City of Highland Park v. Train,* 519 F.2d 681, 696 (7th Cir. 1975), cert. denied, 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976); *Hanna v. Drobnick,* 514 F.2d 393, 398 (6th Cir. 1975); *Roane v. Callisburg Independent School District,* 511 F.2d 633, 635 n. 1 (5th Cir. 1975). The Supreme Court, in *City of Kenosha v. Bruno,* 412 U.S. 507, 514, 516, 93 S.Ct. 2222, 37 L.Ed.2d 109 (1973), appeared to approve this view. It will be followed here.[38]

---

**38.** The difficulty attending this issue stems largely from the question of whether a damage remedy should be implied from the Fourteenth Amendment, an issue not directly dealt with in all of the decisions upholding jurisdiction under § 1331. But a dispute over proper remedies does not go to subject-matter jurisdiction. At least, an action involving the requisite amount in controversy should lie under 28 U.S.C. § 1331 for injunctive and declaratory relief. See *Bivens v. Six Unknown Fed. Narcotics Agents,* 403 U.S. 388, 400–07, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971) (Harlan, J., concurring). To be sure, the availability of injunctive and declaratory relief against the institution is largely irrelevant because the same relief is available against the individual defendants, over whom subject-matter jurisdiction is clear. But, in light of the uncertainty as to jurisdiction over the institutional defendants under 28 U.S.C. § 1331, the court will reserve judgment on the harder question of whether a remedy in damages is available.

Left for later, with other things, is for each member of the class to prove the requisite amount in controversy. See *City of Kenosha v. Bruno, supra* at 514, 93 S.Ct. 2222; *Hague v. C.I.O.,* 307 U.S. 496, 507, 59 S.Ct. 954, 83 L.Ed. 1423 (1939).

Plaintiffs' attempt to short-circuit their jurisdictional difficulties by seeking to invoke this court's pendent jurisdiction must fail. Even if the court elected to exercise its pendent jurisdiction over plaintiffs' state law claims, this would not provide subject-matter jurisdiction over the institutional defendants. The Supreme Court has now ruled that pendent-party jurisdiction is unavailable in civil rights actions. See *Aldinger v. Howard,* —— U.S. ——, 96 S.Ct. 2413, 49 L.Ed.2d 276 (1976). Nor may jurisdiction be founded on 42 U.S.C. § 2000d and 28 U.S.C. § 1343(3), since the Biomedical Program was not funded by federal monies until after the discrimination had occurred. Thus, jurisdiction over the institutional defendants lies, if at all, under 28 U.S.C. § 1331.

### B. *Exhaustion:*

Defendants' answer asserts that plaintiffs' action is barred because they failed first to take their complaints to the Commissioner of Education pursuant to N.Y. Educ. Law § 313(5). This defense was not raised in defendants' trial or post-trial memorandum. Assuming that the defense had not been abandoned, it is now rejected on the merits.

Although the Supreme Court has indicated that neither judicial nor administrative state remedies must be pursued prior to filing an action under 42 U.S.C. § 1983, see *Ellis v. Dyson,* 421 U.S. 426, 432, 95 S.Ct. 1691, 44 L.Ed.2d 274 (1975); *Steffel v. Thompson,* 415 U.S. 452, 472–73, 94 S.Ct. 1209, 39 L.Ed.2d 505 (1974), our Circuit has adhered to the view that *administrative* remedies must be exhausted if they are adequate and their pursuit would not be futile. See *Plano v. Baker,* 504 F.2d 595, 597 (2d Cir. 1974); *Fuentes v. Roher,* 519 F.2d 379, 386 (2d Cir. 1975); *Cordova v. Reed,* 521 F.2d 621, 624 (2d Cir. 1975); *Ei-*

*sen v. Eastman,* 421 F.2d 560 (2d Cir. 1969), cert. denied, 400 U.S. 841, 91 S.Ct. 82, 27 L.Ed.2d 75 (1970). The question here, then, is whether the remedy provided in § 313(5) of New York's Education Law is within the class of remedies that must be exhausted before coming to federal court.

State administrative remedies may be inadequate for a number of reasons. For our purposes, the most relevant considerations are (1) the scope of relief available under the state scheme compared with what is sought in the complaint, and (2) the finality of the administrative relief.

Section 313 provides in pertinent part:

"It shall be an unfair educational practice for an educational institution * * [t]o exclude or limit or otherwise discriminate against any person or persons seeking admission as students to such institution because of race, religion, creed, color, or national origin * * *.

"Any person seeking admission as a student who claims to be aggrieved by an alleged unfair educational practice * * may * * * make, sign and file with the commissioner of education a verified petition which shall set forth the particulars thereof * * *."

The Commissioner investigates the charge, and if he determines that there is probable cause to believe the charge is true, he tries to eliminate the practice by "informal methods of persuasion." If that fails, he has the power to refer the matter to the Board of Regents, which issues a complaint against the offending institution. A formal public hearing is held. If the Regents find that the institution committed an unfair educational practice, they make written findings of fact and conclusions and serve them on the institution, together with a cease and desist order, "or such other order as they deem just and proper." The Board may then apply to a state court "for the enforcement" of the order. The court has "power to make an order annulling or confirming, wholly or in part, or modifying the determination reviewed."

Although the adversary procedures under § 313 seem adequate to the task of deter-

mining whether racial discrimination has occurred, cf. *Plano v. Baker, supra,* 504 F.2d at 598, the scope of available relief and lack of finality of the Board's order render the state remedy inadequate. Should the Board of Regents find that racial discrimination has occurred, it may, in addition to issuing a cease and desist order, penalize the offending institution by (1) censure and/or (2) the withdrawal or suspension of the registration of any program of the institution, 8 N.Y.C.R.R. § 19.4(f) (1974). Neither it nor the Commissioner has power to award damages. See *Plano v. Baker, supra,* 504 F.2d at 599, *Ray v. Fritz,* 468 F.2d 586, 587 (2d Cir. 1972). Moreover, the Commissioner by the terms of § 313, is not required to refer the complaint to the Board of Regents [39] which, in turn, must go to court to enforce its order. The ultimate remedy is thus "judicial" rather than administrative. Given these shortcomings in the state remedial scheme, no federal court may require exhaustion. See, e. g., *McNeese v. Board of Education,* 373 U.S. 668, 83 S.Ct. 1433, 10 L.Ed.2d 622 (1963); *Eisen v. Eastman, supra,* 421 F.2d at 568.

*C. Mootness:*

▮▮▮ Defendants argue that any of plaintiffs' claims arising out of the procedure for selecting alternates has been rendered moot by the remedial actions taken in June 1975 and the overall changes made in the selection process. The court disagrees. It is not at all clear that the rectification procedure undid the damage to those members of the class who were injured by the discriminatory selections. Thus, a declaration of the parties' rights and an appropriate injunctive order may be necessary to accord the affected class members the relief to which they are entitled. The question of monetary damages also remains. Moreover, "[m]ere voluntary cessation of allegedly illegal conduct does not moot a case \* \* \*." *United States v. Phosphate Export Ass'n,* 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968). Adopting new procedures does not ensure that there will not be future discrimination; the discrimination that occurred in 1974 was not a necessary by-product of the 1974 admission procedures. See *DeFunis v. Odegaard,* 416 U.S. 312, 318, 94 S.Ct. 1704, 40 L.Ed.2d 164 (1974).

II. *Unlawfulness of the Discrimination*

A. *Equal Protection:*

When this case began, it appeared that the so-called "reverse discrimination" that was alleged might be the occasion for deciding the interesting and difficult constitutional questions left open by the Supreme Court in *DeFunis v. Odegaard, supra.* And there were intimations along the way that special concerns of cultural understanding and physician-patient rapport might support special preferences for minority applicants for programs of training to practice urban medicine. But as the case developed, it became apparent that the legal task was simpler and clearer.[40]

The defendants have steadfastly maintained that they did not intentionally discriminate on the basis of race prior to the selection of the alternates, and that any discrimination that did occur violated Committee, University, and Board policy. In these circumstances, the intentional racial discrimination found by the court cannot withstand scrutiny under the equal protection clause.[41]

---

**39.** The option, however, is seemingly made mandatory by 8 N.Y.C.R.R. § 19.4(c).

**40.** The NAACP Legal Defense and Educational Fund apparently came to share the court's view of the case. Having obtained leave to participate as *amicus* with an obvious concern for the *DeFunis* problem, the Fund withdrew from the case after trial.

**41.** Defendants at times seem to argue that the equal protection clause can only be violated by high state officials acting pursuant to a formally adopted law or policy. That is not the law. As the Supreme Court stated in *Cooper v. Aaron,* 358 U.S. 1, 16–17, 78 S.Ct. 1401, 1409, 3 L.Ed.2d 5 (1958):

> "The controlling legal principles are plain. The command of the Fourteenth Amendment is that no 'State' shall deny to any person within its jurisdiction the equal protection of the laws. 'A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency

■ Whatever standard of scrutiny is ultimately fashioned in "reverse discrimination" cases, it is clear that the State cannot justify making distinctions on the basis of race without having first made a deliberate choice to do so. See *Hampton v. Mow Sun Wong,* 426 U.S. 88, 96 S.Ct. 1895, 48 L.Ed.2d 495 (1976); *Sweezy v. New Hampshire,* 354 U.S. 234, 251–55, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957); *United Jewish Organizations v. Wilson,* 510 F.2d 512, 528–34 (2d Cir. 1975) (dissenting opinion), cert. granted, 423 U.S. 945, 96 S.Ct. 354, 46 L.Ed.2d 276 (1975). See also Greenawalt, *Judicial Scrutiny of "Benign" Racial Preference in Law School Admissions,* 75 Colum.L.Rev. 559, 599–602 (1975); Sandalow, *Racial Preferences in Higher Education: Political Responsiblity and the Judicial Role,* 42 U. of Chi.L.Rev. 653, 698–703 (1975). Whether the Board of Higher Education, the Faculty Senate of City College, or someone else in authority might permissibly adopt a racial quota or some other means of discriminating by race, or whether that sensitive task must be left to the legislature, see *Sandalow, supra,* at 698, is not the issue. Nor are we even confronted with the question of whether the State, whoever it may be in a given instance, must explicitly declare the reasons for a policy or law permitting or requiring distinctions on a racial basis. The answer may well be different depending upon whether it is the legislature or the executive that is acting. But that problem is not presented where, as here, the state officials explicitly disclaim the distinctions made, both before and after the fact.

■ While perhaps not every classification by race is "odious," every distinction made on a racial basis is at least suspect and must be justified. See *Hirabayashi v. United States,* 320 U.S. 81, 100, 63 S.Ct. 1375, 87 L.Ed. 1774 (1943); *Korematsu v. United States,* 323 U.S. 214, 65 S.Ct. 193, 89 L.Ed. 194 (1944). It cannot be accomplished thoughtlessly or covertly, then justified after the fact. The defendants cannot sustain their burden of justification by coming to court with an array of hypothetical and *post-facto* justifications for discrimination that has occurred either without their approval or without their conscious and formal choice to discriminate as a matter of official policy. It is not for the court to supply a rational or compelling basis (or something in between) to sustain the questioned state action. That task must be done by appropriate state officials *before* they take any action. As the record now stands, the State, as represented by these defendants, rejects race as a proper admission criterion, even in a program with objectives that might arguably justify its use. There is, then, no basis for the distinctions that were made by the State's agents on the basis of race.

In sum, the discrimination found to have taken place violated the equal protection clause.

**B.** *Due Process:*

Although it was not fully recognized by Dr. Gellhorn in the spring of 1974, it is clear from the testimony of Chancellor Kibbee and President Marshak that there was and is an "unwritten," but unequivocal, Board and University policy against employing race *per se* as an admissions criterion. The policy is further evidenced by the explicit rejection of racial quotas for the Biomedical Program by the Faculty Senate and the 1973 Admissions Committee. Finally, § 313(1) of New York's Education Law expresses a similar judgment by the legislature:

"It is hereby declared to be the policy of the state that the American ideal of equality of opportunity requires that students, otherwise qualified, be admitted to

of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, . . . denies or takes away the equal protection of the laws, violates the constitutional

inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning.' *Ex parte Virginia,* 100 U.S. 339, 347, 25 L.Ed. 676.

educational institutions [City College falls within the definition of an 'educational institution'] without regard to race, color, religion, creed or national origin  *  *."

█ It is by now familiar law that an agency's violation of its own regulations may in and of itself constitute a violation of due process. See, e. g., *Accardi v. Shaughnessy,* 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); *United States v. Leahey,* 434 F.2d 7 (1st Cir. 1970); *Sangamon Valley Television Corp. v. United States,* 106 U.S. App.D.C. 30, 269 F.2d 221 (1959). "An agency of the government must scrupulously observe rules, regulations, or procedures. which it has established. When it fails to do so, its action cannot stand and courts will strike it down." *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir. 1969). Such deviations "cannot be reconciled with the fundamental principle that ours is a government of laws, not men." *Hammond v. Lenfest,* 398 F.2d 705, 715 (2d Cir. 1968).

█ The sweep of the doctrine is broad. Its applicability does not turn upon the formality of the embodiment of the pertinent policy. See, e. g., *United States v. Heffner, supra,* 420 F.2d at 812 (IRS instructions); *Smith v. Resor,* 406 F.2d 141, 143–44 n. 2, 146 (2d Cir. 1969) (Army newsletter); *Sangamon Valley Television Corp. v. United States, supra,* 269 F.2d at 224–25 (usual FCC practice). Cf. *Yellin v. United States,* 374 U.S. 109, 116–17, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963) (prior congressional behavior). This is so because the same "danger of inconsistent treatment also exists when an agency departs from an unpublished rule or informal practice." Note, *Violations by Agencies of Their Own Regulations,* 87 Harv.L.Rev. 629, 636 (1974). See also *United States v. Heffner, supra,* 420 F.2d at 812. Contrary to the intimations of defendants' counsel, the doctrine is not confined to safeguards assuring fair hearing procedures. See, e. g., *Caputo v. Sharp,* 286 F.Supp. 516 (E.D.Pa.1968); *United States v. Leahey, supra.* It is also irrelevant that the policy may be "more generous than the Constitution requires." *United States v.*

*Heffner, supra.* See also *Service v. Dulles,* 354 U.S. 363, 388, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1959).

█ When the subcommittee intentionally eliminated only non-minority students from the original list of 94 "Yesses" and later proportionately chose alternates by race, it deviated from University policy, as enforced by state law, and violated due process. This conclusion is not premised on the view that the Constitution invariably forbids the use of race as an admissions criterion. See, e. g., *DeFunis v. Odegaard,* 82 Wash.2d 11, 507 P.2d 1169 (1973); Ely, *The Constitutionality of Reverse Racial Discrimination,* 41 U. of Chi.L.Rev. 723 (1974). But where, as here, there is a deliberate departure from a contrary policy, both due process and equal protection rights are infringed. Cf. *Yick Wo v. Hopkins,* 118 U.S. 356, 373–74, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Note, *Violations by Agencies of Their Own Regulations, supra,* 87 Harv.L. Rev. at 644 n. 56.

### III. *Liability of the Defendants for the Unlawful Discrimination*

The decision to bifurcate the trial requires that the precise allocation of liability be left for the second stage. The questions of who, if anyone, is liable for damages, and to whom, and in what amounts, are postponed for further briefing and proof. Again, as with jurisdiction, it may be useful to offer some guidelines at this point.

### A. *Injunctive and Declaratory Relief:*

█ It has long been the law that officials, acting in their official capacities, are subject to injunctive and declaratory relief for violating constitutional rights. See, e. g., *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908); *Edelman v. Jordan,* 415 U.S. 651, 663–68, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). That principle governs here. That one or more of the defendants may not have been directly involved in the commission of the discrimination is no bar; governmental entities and superior officials may be held responsible for the constitutional violations of their subordinates

for the purposes of injunctive and declaratory relief. See, e. g., *Green v. Kent*, 369 F.Supp. 1124, 1127 (W.D.Va.1974).

The plaintiffs are thus entitled now to an order against the individual defendants declaring their actions unconstitutional and enjoining them from further violations. Since the award of other injunctive relief, if any, must await the second stage, the court leaves to the plaintiffs' counsel the decision as to whether any order should now be entered.

B. *Damages:*

■ The problem of damages is more complicated. Even assuming that there is jurisdiction over the institutional defendants, it would seem that they may nevertheless be immune from liability for damages pursuant either to the Eleventh Amendment or the analogous doctrine for municipal entities. See, e. g., *Monell v. Dept. of Social Services, supra*, 532 F.2d at 264–266. Furthermore, if they are not totally insulated by these doctrines, it may [42] be that they cannot, in any event, be held vicariously liable for the unconstitutional conduct of their agents, see *Fine v. City of New York, supra*, 529 F.2d at 76 n. 13, or at least not unless one of their agents is liable. Whether any of the individual defendants is liable is also in doubt at this juncture.

■ For any of the individual defendants to be liable for damages, they must be held to have been acting in "bad faith." "Bad faith" in this context has two aspects. First, to avoid the characterization of bad faith, the official in question "must be acting sincerely and with a belief that he is doing right * * *." *Wood v. Strickland*, 420 U.S. 308, 321, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). That determination

cannot be made from the record thus far compiled. Even if the defendants are ultimately proved to have been acting in subjective good faith, they may nonetheless be liable for damages if they acted in "ignorance or disregard of settled, indisputable law * * *." *Id.* To be sure, they are not "charged with predicting the future course of constitutional law." *Pierson v. Ray*, 386 U.S. 547, 557, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967). In light of the sharp split among legal scholars over the question of the constitutionality of reverse discrimination, these defendants, if they acted with the requisite subjective state of mind, might on that score escape liability. But there was another constitutional violation here—the departure from the Board's own policy against using race as an admissions criterion. Any defendant who knew, or should have known, of this policy and deliberately departed therefrom would seemingly be liable, irrespective of whether he thought he was doing the right or "fair" thing.

■ There is the further question of whether these defendants, or any of them, may be held liable for the discriminatory actions of their subordinates. While the doctrine of *respondeat superior* is of limited application in actions under 42 U.S.C. § 1983, see *Johnson v. Glick*, 481 F.2d 1028, 1034 (2d Cir.), cert. denied, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 32 (1973), a defendant might be liable if he knew or recklessly disregarded the danger that the subcommittee was likely to make its selections on the basis of race. Cf. *Williams v. Vincent*, 508 F.2d 541, 546 (2d Cir. 1974). To hold any of the defendants vicariously liable, it may also be necessary to show that the persons who were directly involved in the discrimi-

---

**42.** In *Monell v. Dept. of Social Services, supra*, the Second Circuit held that municipal agencies are not liable in damages under § 1983 on the theory that since they are not suable directly, they may not be sued indirectly by merely naming their agents as defendants. Left open was the question of whether a different rule would obtain if the action had been brought under 28 U.S.C. § 1331. Id. 532 F.2d at 260 n. 1. See also *Fine v. City of New York, supra*,

529 F.2d at 76 n. 13. The Eleventh Amendment, of course, provides immunity to states and their "alter egos" irrespective of the jurisdictional basis. See *Edelman v. Jordan*, 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). Whether the respective institutional defendants are better characterized as state or municipal entities, or perhaps both, is not necessary to decide now. The parties should, however, address these questions at the appropriate time.

natory conduct were themselves acting in bad faith. Professor Baumel's state of mind at the time the subcommittee "traded" a Caucasian for a Latin alternate would seem to supply at least one instance. Others may be developed later when the record in this case is expanded.

■ While one must be personally involved in unconstitutional conduct to be held liable under § 1983, it would seem that such responsibility can be predicated on a failure to act. See *Azar v. Conley*, 456 F.2d 1382, 1387 (6th Cir. 1972); *Ingram v. Dunn*, 383 F.Supp. 1043, 1045 (N.D.Ga.1974), aff'd without opinion, 514 F.2d 1070 (5th Cir. 1975). It is at least arguable that the individual defendants are liable if they perpetuated the effects of their subordinates' discriminatory actions by covering up its occurrence and failing to take corrective action. In addition to a full briefing of this legal theory, there may be a need for a fuller factual record as to each defendant's actions after he knew that the discrimination had taken place.

### C. Attorneys' Fees:

Beyond the question of liability for compensatory damages, there is the somewhat separate question of whether the defendants, or any of them, either in their personal or official capacities, may be required to pay reasonable counsel fees.

■ While liability for counsel fees and compensatory damages both turn upon "good faith" in one form or another, responsibility for the former also rests in part on the good faith resistance to plaintiffs' lawsuit. See, e. g., *Runyon v. McCrary*, — U.S. ——, 96 S.Ct. 2586, 49 L.Ed.2d 415 (1976); *Class v. Norton*, 505 F.2d 123, 126, 127 (2d Cir. 1974); *Stolberg v. Members of the Board of Trustees*, 474 F.2d 485, 490 (2d Cir. 1973). Moreover, since the recovery of attorneys' fees has only an "ancillary effect" on the state treasury, the Eleventh Amendment is no defense, assuming it may be invoked at all by these institutional defendants. See, e. g., *Fitzpatrick v. Bitzer*,

519 F.2d 559, 571–72 (2d Cir. 1975), rev'd on other grounds, — U.S. ——, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976); *Class v. Norton, supra*, 505 F.2d at 126.

The court is not prepared to say at this time that the defendants are liable for counsel fees, but there are things already in the record pointing in that direction. It is admitted by all that the discrimination in the selection of alternates violated Board policy and that each of the defendants knew that it had occurred no later than May 1974. There is also evidence that at least one or more defendants thought that the 15 eliminated "Yesses" had been discriminated against at both stages of the subcommittee's operations. And yet nothing was done for these candidates until after trial, some two years after the injury had taken place. The court was struck, too, by the number of contradictions between the trial testimony of various witnesses and written statements made closer to the time of the events in question. There was a sense that at least some witnesses were under a great deal of stress and pressure in connection with their testimony. These are merely rough impressions, to be tested and considered at greater length at the second stage of the trial before deciding if they, and/or other things yet to be presented, demonstrate " 'obstinate obduracy' or bad faith in contesting the action." *Runyon v. McCrary, supra*, at ——, 96 S.Ct. at 2600. See also *F. D. Rich Co. v. United States*, 417 U.S. 116, 129, 94 S.Ct. 2157, 40 L.Ed.2d 703 (1974); *Thonen v. Jenkins*, 517 F.2d 3, 6–8 (4th Cir. 1975).

\* \* \* \* \* \*

In view of the complexities flowing from the bifurcation of this action, the court will await guidance from the parties as to (a) what order, if any, should now be entered to reflect the court's conclusion that the defendants committed intentional racial discrimination in violation of the Constitution in connection with the 1974 admissions process to the Biomedical Program, and (b) how to proceed from here to the second stage of trial.